**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Burton HIGHAM, Defendant–Appellant.**

No. 95–3055.

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1996.

Decided Oct. 18, 1996.

Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Julia Getzels (argued), Chicago, IL, for Plaintiff–Appellee.

Kevin E. Milner (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, EASTERBROOK, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Burton Higham hired someone he believed to be a hitman (actually, an undercover FBI agent) to kill his business partner, hoping to collect on a life insurance policy. A jury convicted him on charges that he used the mail in the commission of a murder-for-hire scheme (18 U.S.C. § 1958(a)) and committed mail fraud (18 U.S.C. § 1341). The district judge ordered him to serve a prison term of 120 months on the murder-for-hire counts and a consecutive term of 60 months on the mail fraud counts. Higham appeals, arguing that the evidence against him was insufficient, that the prosecution improperly cross-examined him as to prior acts of violence, and that he is entitled to a new trial in light of newly discovered evidence as to the government's informant. Finding no merit to these contentions, we affirm.

## I.

In 1994, Higham found himself deep in debt after the failure of two businesses. In December of that year, he sought the help of an acquaintance, John Burroughs, Jr., in collecting a $10,000 debt owed to his latest venture, Team Transport, Inc. Eventually, their discussions turned to another plan: killing Higham's partner in Team Transport, Bill ("Skip") Yates and collecting on the $250,000 insurance policy that Higham had taken out on Yates' life when the company was formed. (Higham and Yates had taken out policies on one another's lives so that in the event either of them died, the survivor could buy out his deceased partner's share of the business.) Just who came up with this idea is disputed: Burroughs claimed that Higham thought it up, while Higham claims that Burroughs suggested it and that Higham warmed to the notion slowly. Ultimately, however, Higham did embrace the plan.

Burroughs then contacted the FBI and helped arrange a meeting with Agent Jim Martin, who posed as a hit man willing to commit the murder for a $50,000 share of the life insurance proceeds. Higham and Martin met at a Denny's restaurant in Addison, Illinois on January 17, 1995 and discussed the murder over coffee. Higham went on at length about his woes and the merits of Yates' anticipated demise. Martin instructed Higham to pay the back premiums on the life insurance policy, which was on the verge of lapsing, and to send him a copy of the policy along with a picture of Yates. After a number of followup telephone calls from Martin,

Higham mailed him the policy and photograph ten days later. On February 6, Martin telephoned Higham and reminded him to bring the premiums up to date. On February 8, Martin met with Higham and told him that he had killed Yates. Higham was taken into custody immediately after that meeting.

## II.

Higham was charged with three counts of using an interstate commerce facility (the U.S. mail) to commit a murder-for-hire and three counts of mail fraud. The jury convicted him on all six counts.

### A. Sufficiency of the Evidence

■ Higham argues that the government failed to present sufficient evidence from which a jury could reasonably conclude that he was not entrapped. The scheme to murder Yates was pursued almost exclusively by Burroughs and then Martin, Higham maintains, and he was dragged along reluctantly and halfheartedly. According to Higham, Burroughs hatched the idea in order to have something to trade with federal officials, who had filed a petition in court seeking to have his supervised release on a 1991 counterfeiting conviction revoked. As Higham tells the story, he balked at Burroughs' suggestion and at first told him that killing Yates was out of the question. But Burroughs kept at him, telephoning him daily, taking advantage of Higham's depressed emotional state, dangling the prospect of collecting the $250,000 in insurance proceeds, "pound[ing] the idea home until it began to sound more and more plausible." Higham Br. 15. When Higham said he didn't know anyone willing to commit murder, Burroughs quickly said he had a "friend" in mind; and when Higham said he had no money to pay for the murder, Burroughs assured him that his friend would be willing to collect his fee from the insurance proceeds. Thus Higham was lured into Burroughs' trap. And once he was ensnared, Agent Martin took over. Martin "shamelessly led Burt by the hand as he directed him straight to a criminal conviction." Higham Br. 18. Martin directed Higham to send him a copy of the policy and a photograph of Yates by mail, which would satisfy the juris-

dictional element of the offenses with which Higham was later charged. He advised Higham to make sure that the insurance policy on Yates, the premiums for which were five months in arrears, was still in force. He then telephoned Higham repeatedly to remind him to complete his assigned tasks, and only after ten days of such calls did Higham finally do so. "Was agent Martin really trying to fight crime at this point, to prevent it," Higham asks, "or was he instead trying to keep one alive?"

Higham summarizes:

Yates had never been harmed or threatened. Burt had never attempted, on his own, to hire anyone to harm Yates. His only crime was that he listened to Burroughs and then Martin as they layed [*sic*] everything out for him. Burroughs, a despicable criminal desperately trying to keep out of jail, and Martin, a supposed crime fighter, more interested in creating crime than preventing it. Both of them taking full advantage of the fragile and vulnerable condition that Burt was in at the time. This case could have ended before it even began. Instead, Burt sits in a jail serving a 15 year sentence.

Higham Br. 21.

Yet, the evidence, when viewed in a light most favorable to the government (*e.g., United States v. Gonzalez*, 93 F.3d 311, 319 (7th Cir.1996)) suggests that Higham was contemplating Yates' demise well before he ever talked to Burroughs. Higham remarked to an employee in February or March 1994, and again in May, that Yates was worth more to him dead than alive. In July 1994, after Team Transport had shut down, Higham's insurance agent, Michael Urbik, asked Higham what he wished to do with the insurance policies he and Yates had taken out on one another's lives when they formed the business. Higham elected to keep the policy on his own life, making his family the beneficiary rather than Yates. He also elected to keep in force the policy on Yates' life, of which he was the beneficiary. He explained to Urbik that Yates owed him some money. After paying the premiums on both policies in August, Higham fell into arrears; but when Urbik called him later that year, Hig-

ham told him that he still wished to keep both policies in force. Higham told Urbik in December that Yates' health was so poor that he was "a bit of a walking time bomb." In fact, the only health problem from which Yates suffered was high blood pressure, which was controlled by medication. Weeks later, in mid-January, Higham told Urbik that he expected Yates to die in the near future. That same month, he told a creditor not to worry, "[e]verybody is going to get what's coming to them," because he would be coming into some money. In early February, just before Martin was supposed to kill Yates, Higham told Anthony Urbik (Michael's brother and partner), that "he didn't think Skip was going to be around a long time."

Indeed, according to Burroughs, it was Higham who came up with the idea to kill Yates and it was for that reason Higham contacted him in the first place. Burroughs, in fact, understood Higham to want Burroughs himself to commit the murder in exchange for the $50,000 share of the insurance proceeds later offered to Martin. Burroughs then contacted the authorities through his attorney, fearful that Higham was setting him up. The meeting between Higham and Agent Martin was subsequently arranged.

Martin wore a wire to the January 17 meeting at Denny's, and the recording reveals Higham to have been an enthusiastic participant in the scheme to kill Yates at this juncture. Although Burroughs was to have been present at the meeting, he arrived late, after Higham and Martin had finished discussing the plan to kill Yates. At the outset of the meeting, when Martin asked Higham what "the deal" was on his partner, Higham explained that he had a life insurance policy on the man "which I'm like 5 months behind on right now." R. 66 Ex. 3A at 3. "But," he assured Martin, "all I gotta do is just pay it up, you know ah, um, I just been screwed, I just been tight for money you know." *Id.* "I'm just tired of doin' the right fuckin' thing," Higham went on to explain. *Id.* at 4.

Higham recounted his initial discussion of the plan with Burroughs, to whom, Higham said, he had "offered" this project first. *Id.* at 5. But Burroughs, Higham knew, had problems of his own. *Id.* "And I told him, I said John I don't, I don't want it to be you. You know what I mean ... just somebody." *Id.* Not that Higham wasn't up to the task himself:

It's like this, I'll be honest with you. I don't need a guy, I'll go do it my motherfuckin' self. My problem is I got 3 children, I got, you know, I got, I'm always been too much of a responsible fuckin' guy. You know what I mean, I got people that depend on me, my children, you know, so....

*Id.* at 9.

Killing Yates would not be difficult, Higham insisted. "[I]t's an easy thing because [Yates], he's an alcoholic, he's got high blood pressure, he you know, he's overweight ah, he's not working." *Id.* at 5. Indeed, "he should already be dead." *Id.* at 13. "His blood pressure is like 200 over something. It's like impossible." *Id.* "And u(m), you know he drinks like a fuckin' fish. Ah, I mean, a broad could kick his ass (like in a fuckin' second)." *Id.* at 7.[1]

You know, (UI) (he,)[h]e's destined. The doctor that he went to for his heart, can't believe he's still walking. Guys like that live forever, they do, they really do.

*Id.* at 25. So Nature needed a little help hastening Yates' demise.

Higham had no doubt that this was the right thing to do. "[H]e'd be better off dead," Higham insisted. *Id.* at 7. And "this ain't just for me." *Id.* at 21. "You know it's for a lot of people you know. A lot of people'd be better off." *Id.* Higham described Yates for Martin and gave him directions to where Yates lived. *Id.* at 5–7. Higham even had suggestions for ways in which Martin might finish Yates off. "[F]rom what I under, what I've always understood, is that Insulin would create a heart attack. That's what I've understood. I don't know." *Id.* at 7. Or perhaps "if you just

---

**1.** The additions and revisions in parentheses are not reflected in the transcript but are audible on the tape recording.

held that motherfucker's head straight, and just poured, just kept pouring fucking alcohol, he'd drown in that fuckin' alcohol. [Laughs]" *Id.* at 13.

Higham operated under no delusion that he was free of responsibility for the anticipated murder of Yates simply because someone else would be doing the killing. Early on in the meeting, Martin adverted to Burroughs' absence and warned Higham that the details of their plan should be kept between the two of them. *Id.* at 8. The greater the number of people who knew about their intentions, the greater the risk that they would be caught. *Id.*

> SA MARTIN: And if this policy's in force, and I do this guy ... who they gonna come to first?
>
> HIGHAM: Oh it'll be, come to me.
>
> SA MARTIN: You bet your ass.
>
> HIGHAM: No doubt, no doubt, no doubt. And what my concern is, is when, is when it does, or, you know, as it does, how it goes, how I, you know, send it out, is, could, could, could catch you, know what I mean. That's ...
>
> SA MARTIN: Yeah.
>
> HIGHAM: Okay.
>
> SA MARTIN: I'm the one that's holdin' the trick bag here.
>
> HIGHAM: Well, if, if I'm the guy that tells you to do it ... I'm the guy ...
>
> SA MARTIN: Yeah but it's ...
>
> HIGHAM: You see what I mean.
>
> SA MARTIN: ... yeah but if I do it I'm the guy.
>
> HIGHAM: Doesn't matter, because.
>
> SA MARTIN: Well, yeah it does, then we're both in trouble.

*Id.* at 8–9.

Finally, after questioning Martin about the mechanics of filing a claim once Yates was killed (*id.* at 20–21), Higham thought aloud about what he would do with the check from the insurance company:

> So initially, I'll stick it in my bank, I'll let the motherfucker clear and all that, and then immediately I'll withdraw like a hundred and sixty of it, and then I'll go put some in here, some in there, then I'll start

throwin' (it) out in cash ... 4 or 5,000 at a time just cash, flat cash and then you know that's ... you know what I mean.

*Id.* at 31.

Approximately three weeks later, when Martin met with Higham and told him that Yates had been killed, Higham seemed anything but the reluctant participant in the scheme. Reflecting on Yates' purported death, Higham quoted Dickens' famous line that "the needs of the many outweigh those of the few." R. 66 Ex. 9A at 8. "His family, everyone'll benefit from this." *Id.* Higham seemed to have no qualms about what he had hired Martin to do:

> You know everything ain't bad, Jim. Everything's not bad. This was good. I'll tell ya 'cause I'm not a bad person, you know. And some may view this to be a bad thing, fuck 'em, that's 'cause they don't know.

*Id.* at 10. Higham gave Martin $210 in cash so that Martin could leave town for a few days and establish an alibi. *Id.* at 2–3. Higham suggested that they ought to get together in a month or so and fly down to Hilton Head for a weekend of golf. *Id.* at 11.

When he took the stand at trial, Higham claimed that Burroughs was the one who suggested that they "do Skip." Although he conceded that he ultimately went along with the idea, Higham insisted that he never thought it was the right thing to do. To him, the whole thing just seemed surreal. Were it not for the involvement of Burroughs and Martin, he would never have pursued the plan to kill Yates. On cross-examination, however, Higham conceded that his participation in the scheme was not the result of any threats against him. He also acknowledged a history of threatening behavior: on one occasion, he told a group of men that he would pick one of them, tie him to his bumper, and drag him around the parking lot for awhile until they identified the fellow who owed him money; on another occasion, he told Yates that he was "going to rip his head off" if Yates didn't stop sending creditors to pester him.

■ Given all of this evidence, the jury was well within the realm of reason in finding

that Higham had committed the offenses charged and that he had not been entrapped by the government. An entrapment defense requires the jury to resolve two related issues: (1) whether the government induced the defendant to commit the crime, and, if so, (2) whether the defendant was predisposed to commit the offense. *United States v. King,* 75 F.3d 1217, 1223–24 (7th Cir.1996); *United States v. Rodriguez–Andrade,* 62 F.3d 948, 954 (7th Cir.1995); *United States v. Akinsanya,* 53 F.3d 852, 858 (7th Cir.1995). Once the defendant has presented evidence that he was induced to engage in criminal activity, "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States,* 503 U.S. 540, 549, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992); *see also Rodriguez–Andrade,* 62 F.3d at 954; *United States v. Groll,* 992 F.2d 755, 759 (7th Cir.1993).

On the matter of inducement, there was ample evidence from which the jury might fairly have concluded that the idea to kill Yates originated with Higham, not Burroughs.[2] Burroughs, as we have mentioned, testified that Higham proposed the murder and in fact wanted him to commit it. And indeed, Higham's own remarks to Agent Martin at the January 17 meeting suggest that Higham did "offer" the task to Burroughs. Whether to believe Higham or Burroughs on this point was the jury's choice and one we will not disturb. *United States v. Long,* 86 F.3d 81, 85 (7th Cir.1996); *United States v. Griffin,* 84 F.3d 912, 927 (7th Cir. 1996). Moreover, even if we assume that Burroughs did float the idea, Higham himself conceded that he warmed to it and eventually signed on. Even if it took some persistence on Burroughs's part before Higham embraced the plan, in the absence of coercion,

that alone does not establish inducement. *Akinsanya,* 53 F.3d at 858 (quoting *United States v. Santiago–Godinez,* 12 F.3d 722, 729 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1630, 128 L.Ed.2d 354 (1994)). Neither Burroughs nor anyone else twisted his arm with the sort of threats, extraordinary promises, or fraud that a showing of inducement requires. *See United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991); *see also Akinsanya,* 53 F.3d at 858.

■ That Higham himself may have suggested the murder of Yates also speaks to the question of predisposition; but other evidence as well suggests that Higham was already of a mind to commit this sort of crime. We typically look to five factors in assessing the defendant's predisposition to commit the offense in question: (1) the character and reputation of the defendant; (2) whether the government first suggested the criminal activity; (3) whether the defendant engaged in the crime for profit; (4) whether the defendant demonstrated a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *United States v. Theodosopoulos,* 48 F.3d 1438, 1444–45 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 191, 133 L.Ed.2d 128 (1995), and *cert. denied,* —— U.S. ——, 116 S.Ct. 2555, 135 L.Ed.2d 1073 (1996); *see also Rodriguez–Andrade,* 62 F.3d at 954. Here, each of these factors points in the government's favor.

1. *Character of the defendant.* By his own account, Higham was no shrinking violet when it came to committing acts of violence or of fraud. We noted earlier that when he discussed the plan to kill Yates with Martin, Higham insisted that he would commit the murder himself were it not that he had a family to think about. *Supra* at 288. To

---

**2.** The government points out that even if Burroughs was the one who suggested that Yates be murdered, that suggestion cannot be attributed to the government because Burroughs did not contact the government until January, 1995, after Higham had already committed himself to the idea. Thus, Higham could claim only that he was lured into the plan by a private actor, and that claim does not relieve him of culpability. *Eaglin v. Welborn,* 57 F.3d 496, 500 (7th Cir.) (en

banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 421, 133 L.Ed.2d 338 (1995); *United States v. Hollingsworth,* 27 F.3d 1196, 1203 (7th Cir.1994) (en banc). The testimony presented at trial supports the notion that Burroughs was not acting as the government's agent when he and Higham first discussed killing Yates. But in light of Higham's claim that newly discovered evidence contradicts this testimony, we do not rely on this argument.

make the point, he recounted his efforts to recoup funds from some individuals that he believed had cheated him. Those efforts included putting a gun in the side of a man and threatening to "blow a hole through [him]" if he did not put everything he had on a counter immediately. R. 66 Ex. 3A at 11. On the stand, in fact, Higham conceded that he had used threats of violence "against many people," including Yates. Tr. 47. Higham was also skilled in hiding his income. For the past four or five years, he explained, he had deposited hundreds of thousands of dollars in cash into his personal checking account, which he had then "loaned" back to his company. He had formulated a similar plan to dispose of the insurance proceeds, telling Martin that he would distribute the money among various bank accounts and then draw it out in cash increments of $4,000 to $5,000. R. 66 Ex. 3A 31–32.

2. *Whether the government suggested the criminal activity.* As we have already noted, the testimony of John Burroughs, not to mention Higham's own remarks to Martin, suggest that Higham himself thought of killing Yates and made that proposal to Burroughs. We reiterate that even if Burroughs had some part in formulating the plan, by the time Higham met with Martin on January 17, Higham was fully committed to the scheme, certain that everyone would be better off if Yates were dead, offering Martin suggestions as to how that end might be accomplished, and outlining a plan for disposing of the insurance proceeds. If the ball was indeed handed to him, Higham took it and ran.

3. *Whether the defendant engaged in the criminal activity for profit.* Higham obviously stood to make a substantial profit from Yates' death. He had kept the insurance policy on Yates even after he shut their business down, telling his agent that Yates owed him money and was likely to die in the near future. Notwithstanding his selfserving remark that "everyone" would be better off with Yates gone, Higham was in a particular position to profit, to the tune of $200,000. His efforts to scrape the money together to pay the overdue premiums on the policy before Martin executed the contract merely

confirmed that Higham was in this unholy scheme for the money.

4. *Whether the defendant evidenced a reluctance to commit the offense, overcome by government persuasion.* This is considered the most important factor in evaluating a defendant's disposition. *Theodosopoulos,* 48 F.3d at 1445. We have already spoken to Higham's evident willingness to have his former partner killed. Higham's suggestion that the mailings that formed the basis for the murder-for-hire as well as the mail fraud charges were made at the insistence of Martin deserves separate attention. As Higham notes, Martin suggested that he send a copy of the insurance policy as well as a photograph of Yates to a Post Office box, when "the materials could have just as easily been handed to Martin in person." Higham Br. 19. Yet, Martin did not belabor the point, and Higham expressed no reluctance to mail them or a preference to get them to Martin in some other fashion. Moreover, that mailing was only one of the three that underlay the charges against Higham. The other two mailings involved transmission of the premium check from Higham to his insurance agency, and in turn from the agency to the insurance company, and these were in no way prompted by the government.

5. *The nature of the inducement or persuasion offered by the government.* We need not belabor this point. At most, Burroughs (if he can be considered the government's agent, *see* n.2, *supra*) pointed out that Higham stood to benefit from Yates' death, and made the whole idea seem "plausible" to Higham. From there, Martin merely played along as a willing hit man. The government did not suggest that Higham purchase the policy on Yates' life; Higham had done that well before he first spoke with Burroughs, with the express intent of recouping Yates' debt to him in the event of Yates' demise. Nor, ultimately, did the government pay the back premiums that kept the policy in force through the date of Yates' fictionalized death. And despite Higham's protestations that it was Martin who insisted that Higham bring the policy up to date, it was Higham who spoke of the need to do this at the outset of the January 17 meeting. Finally, it was not

Martin but Higham who plotted out his plans for the financial windfall Yates' death would bring to him.

## B.  Cross–Examination of Higham

■ In advance of trial, the government had sought leave to introduce evidence during its case-in-chief that Higham had committed acts of violence against three individuals, for the purpose of establishing Higham's intent to have Yates killed. *See* FED. R. EVID. 404(b). The district court denied the request, finding that "the limited probative value of the 'other acts' evidence is substantially outweighed by the danger of unfair prejudice and suggests that the defendant is a man of bad character with a propensity for violence." R. 28. When Higham took the stand at trial, however, the government asked Higham questions about these prior acts of violence. The district judge sustained some of the objections that Higham's counsel raised to these inquiries and overruled others. Ultimately, in the face of continued objections, the court gave the prosecution ten minutes to wrap up its cross-examination, bringing an end to this line of questioning. Later, during its rebuttal case, the prosecution called Ron Nunes to the stand and, at a sidebar, revealed that it planned to elicit testimony from him concerning an incident in which Higham purportedly had put a gun to his head. The court sustained Higham's objection to the testimony, remarking that "this is not proper 404(b), and I think it is highly prejudicial." Tr. 351. Although Higham thus succeeded in keeping much of the testimony concerning his use of violence out of the trial, he nonetheless argues that the government's aborted forays into this area were improper in light of the district court's pre-trial ruling and the objections that the court sustained during the cross-examination of Higham.

We see nothing improper in the government's attempt to elicit testimony in this area, however. The government's pre-trial motion in limine merely sought leave to present evidence as to the prior acts of violence pursuant to Rule 404(b) in its case-in-chief. The court denied that request, and the government did not present any such evidence during its case-in-chief. By the time Higham took the stand, however, the landscape had changed. Higham was pursuing an entrapment defense, and that defense rendered highly relevant evidence as to pertinent aspects of Higham's character, including in particular his predisposition to engage in acts of violence. *United States v. Swiatek,* 819 F.2d 721, 728 (7th Cir.), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). In that respect, the court's pre-trial ruling was really beside the point, for the government had a right to meet Higham's claim of entrapment with evidence that he was predisposed to engage in a murder-for-hire scheme. *See United States v. Bastanipour,* 41 F.3d 1178, 1183 (7th Cir.1994). Moreover, when Higham insisted on direct examination that he would never have entertained the idea of killing Yates but for Burroughs and Martin, he opened the door to inquiries about his willingness to use violence for his own ends, as the district court itself pointed out; that is why the court permitted some inquiry into this area notwithstanding its earlier ruling. The court, of course, retained discretion under Rule 403 to keep out evidence whose probative value was outweighed by the danger of undue prejudice, and we shall assume without deciding that the court acted properly when it limited the government's inquiries into Higham's history of violence. It is enough, for purposes of the claim Higham has raised, to say simply that the government committed no transgression in attempting to elicit testimony on this subject in order to prove that Higham was not entrapped.

## C.  Motion for a New Trial

■ Higham's final claim is that he is entitled to a new trial based on newly discovered evidence that, in his view, suggests that Burroughs was working on the government's behalf in the investigation of Higham earlier than was believed. The government's position at trial was that Burroughs did not begin working with the government prior to January 11, 1995, well after he and Higham had discussed murdering Yates. Thus, the government argued to the jury, anything Burroughs may have done to convince Higham of the merits of the plan could not be considered inducement or persuasion by the government. Tr. 400. After trial, however,

the government disclosed to the defense a letter dated January 19, 1995 from an FBI supervisor to the U.S. Attorney discussing the investigation and referencing a meeting between the U.S. Attorney's office and Burroughs that purportedly had occurred on December 11, 1994. Higham, naturally, argues that this undermines the government's theory of non-accountability for Burroughs' actions prior to January 11.

We need not consider whether this discovery entitles Higham to a new trial. That question is one addressed to the district court's discretion, in the first instance (*see* FED. R. CRIM. P. 33), and Higham has not presented this evidence to the district judge. He did file a motion for a new trial, but as Higham acknowledges (Higham Br. 10 n.1) the belatedly produced letter was not argued as a basis for the motion. It is therefore not a matter for us to take up on appeal.

### III.

As we have discussed, the evidence was more than sufficient to hold Higham accountable for murder-for-hire and mail fraud, and, in view of Higham's entrapment defense, the government did nothing improper in attempting to elicit testimony concerning Higham's prior acts of violence. We therefore AFFIRM Higham's conviction.