UNITED STATES of America,

v.

**Gale NETTLES, Defendant.**

**No. 04 CR. 699(JFK).**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 28, 2005.

See, also, 349 F. Supp.2d 1085.

---

Patrick J. Fitzgerald, United States Attorney, Northern District of Illinois, Chicago, IL (Victoria J. Peters, Brandon Fox, Assistant United States Attorneys, of counsel), for U.S.

John T. Theis, Chicago, IL, for Defendant.

## OPINION and ORDER

KEENAN, District Judge.

### BACKGROUND

Defendant was charged in a nine-count indictment with two counts of attempting to damage and destroy the Dirksen Federal Building by a fire or explosion (18 U.S.C. §§ 844(f)(1) and 844(i))(Counts 1 and 2); one count of attempting to provide material support to terrorism (18 U.S.C. § 2339A)(Count 3); one count of fraudulently making, forging and counterfeiting U.S. Federal Reserve Notes (18 U.S.C. § 471)(Count 4); and five (5) counts of selling, exchanging, transferring and delivering false, forged, counterfeited and altered U.S. Federal Reserve Notes, with the intent that the same be passed, published and used as true and genuine (18 U.S.C. § 473) (Counts 5 through 9). Defendant pleaded not guilty.

This case originally was assigned to a judge in the Northern District of Illinois. Defendant moved to recuse the presiding judge and all judges in the district on the ground that the judges' impartiality was in question because the charged conduct involved a plot that threatened their lives. *See* 28 U.S.C. § 455(a). The presiding judge denied the motion. *United States v. Nettles*, 349 F.Supp.2d 1085 (N.D.Ill.2004). On mandamus, the Court of Appeals for the Seventh Circuit ordered the recusal of all Northern District of Illinois judges. *In re Nettles*, 394 F.3d 1001, 1003 (7th Cir. 2005). The Circuit also recused itself from hearing any appellate proceedings because it too sits in the Dirksen Building. *Id.* The case was then assigned to me, a district judge sitting on the United States District Court for the Southern District of New York.

Trial began on September 6, 2005 before me and a jury. On September 15, 2005, the jury convicted defendant of Counts 1, 2 and 4 through 9. Defendant was acquitted on Count 3. Defendant now moves for acquittal or a new trial under Federal Rule of Criminal Procedure 29(c). He seeks acquittal on the following three grounds:

"(a) The Government failed to prove each and every element of the offense on the two remaining counts alleging attempts to violate the law. The Government failed to prove that the Defendant ever had the specific intent to commit the underlying offense and that he took a substantial step toward its conclusion as required in this circuit. [The Court understands this to be addressed to Counts 1 and 2.]

(b) The Government never proved that the Defendant ever had any intent to defraud when he provided the allegedly counterfeit currency in this case. [The Court takes this to be addressed to Counts 4–9.]

(c) The Government's evidence established as a matter of law that the Defendant was entrapped. The numerous attempts established in this case to persuade the Defendant to commit an act to which he was not predisposed clearly established that the Defendant was entrapped as a matter of law." [The Court assumes this relates to all eight counts of conviction.]

The grounds urged for a new trial are as follows:

"(a) The Court erred in denying Defendant's Motion to Transfer the Proceedings pursuant to Rule 21 of the Federal Rules of Criminal Procedure.

(b) The Court erred in denying Defendant's Pre-trial Motion for Severance of Counts in this cause.

(c) The Court erred in denying Defendant's Motion for Judgment of Acquittal at the end of the Government's case and at the end of all of the evidence in this case.

(d) The Court erred in instructing the jury on the role of the jury in the Government's proposed instruction number 40, which is not a Seventh Circuit Pattern Instruction, and to which the defense objected.

(e) The Court erred in overruling the Defense objections to certain elements of the testimony of the witness Michael Leone, in which he was allowed to testify to speculative matters which were highly prejudicial and which were not relevant to the charge." (Pages 2 and 3 of Defense Motion of October 14, 2005).

### THE FACTS AS DEVELOPED AT TRIAL

The events here really began on September 5, 2002 when defendant was sentenced to a term of imprisonment of 24 months after pleading guilty in the Northern District of Illinois to manufacturing counterfeit U.S. Currency. Mr. Nettles was incarcerated at the Federal Correctional Institute ("FCI") in Yazoo City, Mississippi. Another inmate, Cecil Brown, was also serving time at the FCI in the summer of 2003. Mr. Brown testified that the defendant asked him about ammonium nitrate. Brown stated that defendant, who in prison was known as "Ben Laden," claimed to be familiar with the Chicago federal courthouse (the Dirksen Building). Nettles told Brown that defendant could easily load a truck with ammonium nitrate and put it in the loading dock area of the courthouse. Brown testified that defendant sketched the courthouse in sand in the exercise yard while describing it and his desire to blow up the building.

After Brown told law enforcement about defendant's statements, the F.B.I. provided Brown with a piece of paper which had the telephone number of an undercover F.B.I. telephone in Shreveport, Louisiana. Brown gave this paper to the defendant and told him that it was the number of someone who could get ammonium nitrate. Nettles was released from prison in October, 2003 and he went to the Salvation Army work release center in Chicago to complete his term of imprisonment. In November, 2003, defendant's cell telephone number appeared on a Caller ID device hooked-up to the F.B.I. undercover phone. On November 25, 2003, Larry Reichardt, an undercover F.B.I. Agent, called defendant and told him that he saw his number on his Caller ID. Reichardt offered to have his "bossman" call defendant. Defendant told the agent that he was using the nickname "Ben Laden."

On November 25, 2003 Mr. Nettles, while under surveillance by the F.B.I., traveled by bus in Chicago to Washington and State Streets. He then walked down State Street to the site of the Federal Courthouse (the Dirksen Building). He went to the south or Jackson Boulevard side of the courthouse and was seen looking at and observing the loading dock of the Dirksen Building.

On December 1, 2003, Gary Beasley, another undercover law enforcement officer, called defendant. Through early 2004, Beasley recorded several telephone calls and face-to-face meetings with the defendant. Beasley agreed to supply defendant with a ton of ammonium nitrate fertilizer.

In the recordings with Beasley, defendant discussed what he was going to do with a portion of the ammonium nitrate. Defendant said that the federal courthouse downtown (the Dirksen Building) "is blocking the view of the lake." Defendant stated that he wanted to "collapse the build-

ing" and he had a problem with the whole federal system, including the judge on his counterfeiting case. He further told Beasley that he wanted to take out "a couple of city blocks" and talked about using ammonium nitrate in a truck bomb.

Nettles also told Beasley that he counterfeited money and asked if Beasley would be interested in purchasing some counterfeit.

On December 3, 2003, the defendant was again observed by the F.B.I. going to the Dirksen Building. He took a bus to La-Salle and Washington Streets and walked from there to Adams Street, the northerly side of the courthouse. Mr. Nettles entered the courthouse, got on an elevator and 15 minutes or so later returned to the first floor and left the building.

The F.B.I. utilized the services of a paid informant, Sylvia Anicua. In late April, 2004, Ms. Anicua first met the defendant and began speaking with him frequently. She told defendant her name was Maria. Defendant, without any prompting, told Ms. Anicua that he counterfeited money and she said she had a friend who was interested in counterfeit currency.

On May 22, 2004, defendant delivered $560 in counterfeit bills to Anicua in exchange for $100 in legitimate U.S. Currency. All bills were counterfeit twenty dollar bills with the same serial number.

On May 27, defendant gave $1,500 in counterfeit bills to Anicua in exchange for $300 in U.S. Currency. Again, the counterfeit bills were all twenties with the same serial number.

On May 28, defendant brought Anicua $3,680 in counterfeit bills in exchange for $700 in U.S. Currency. The counterfeits were all twenty dollar bills with the same serial number.

On July 7, defendant exchanged $52,300 in counterfeit bills for $10,000 in U.S. Currency. The counterfeits were all one-hundred dollar bills and had the same serial number. At the July 7 meeting, defendant returned $5,000 of the genuine U.S. Currency to Anicua as payment for brokering the deal.

Defendant sent Beasley priority mail which was received on July 21, 2004. It contained $9,000 in counterfeit currency, in one-hundred dollar denominations. Beasley called Nettles and told him he received the package and that he was not going to have access to the fertilizer much longer because Beasley was getting out of the farming business. He further told defendant that the amount of counterfeit currency that defendant sent was more than enough to pay for the fertilizer and asked how much fertilizer Nettles wanted. Defendant's answer was that he needed enough to set off a two-thousand pound bomb.

In July, 2004, defendant asked Anicua if she knew anyone connected with al Qaeda or Hamas. Anicua later told Nettles that she knew a member of al Qaeda. On July 25, 2004, "Ali" was introduced to the defendant by Anicua. "Ali" was really an undercover F.B.I. Special Agent posing as a Chicago cab driver. Defendant told "Ali" that he had "half a ton of ammonium nitrate." "Ali" asked defendant if he had the ammonium nitrate ready and he said that it was in New Orleans, but that he could make one phone call and have it in Chicago in two days. Defendant added that he has a target in mind: the U.S. courthouse downtown.

"Ali" asked defendant how much he would sell the fertilizer for. Defendant said half a ton would be $15,000 and "Ali" told defendant that $10,000 was acceptable. Defendant agreed to this. Later, defendant asked "Ali" if the U.S. courthouse was an acceptable target.

Defendant met "Ali" again on July 31, 2004 and said that his target would be the

U.S. courthouse. He also stated that there was another courthouse that handles civil matters across the street and that if there was something placed between the two buildings, it would take both courthouses down.

At this same meeting, defendant spoke about bringing down the building around 10:00 or 11:00 in the morning, when the judges would be there. Defendant observed that people pay more attention when people are injured, as opposed to when there is only physical damage to property. "Ali" asked defendant about the prospect of persons not connected with judges being killed, and defendant explained that he viewed this as a "combat strike" in which "there are always friendly casualties." Defendant then went on to observe that more people should have been killed at the World Trade Center and that the American casualties in Iraq did not trouble him. He commented that "the government . . . is what should be hit and to change [sic]. You know people won't change it until they start, start feeling it on this soil . . . . The soldiers dying in Iraq ah, it has an impact. But there's not enough body bags coming back to make them really pay attention."

Defendant described how to make an explosive device. He named the ingredients he would use in addition to fertilizer and how the explosives should be wired for detonation. Defendant explained that the person who placed the bomb could get away quickly because of an expressway's proximity to the building.

On August 4, 2004, at defendant's request, Beasley drove to a storage facility Nettles had rented in Chicago. Beasley delivered what purported to be ammonium nitrate fertilizer. It was actually another fertilizer that had different qualities than ammonium nitrate and therefore could not be made into the bomb defendant was planning to construct. Defendant received ten boxes containing fertilizer. They weighed about five-hundred pounds and were put in the .rental storage facility. Defendant had Beasley hold the remaining ammonium nitrate for delivery to "Ali" the next day. He told Beasley that "Ali" would buy the fertilizer for $5,000, rather than the true $10,000 figure. Defendant said he would pay Beasley $3,000 of the $5,000.

On August 5, 2004, Nettles and Anicua went to a park in Chicago in the early morning. At defendant's instruction, Beasley went to the same park at around 6:00 a.m. with a pickup truck containing the remainder of the fertilizer. "Ali" and two other law enforcement employees acting undercover arrived separately at the park. "Ali" and his two associates transferred the fertilizer from Beasley's pickup truck to another vehicle. Defendant from a distance monitored the transfer with binoculars. Defendant and Anicua then met with "Ali," who paid defendant $10,000 for the fertilizer. Defendant was then arrested.

Defendant's apartment at 1124 West Wilson Avenue, Room 118, was searched by the F.B.I. pursuant to a warrant and in it several incriminating items were seized. Among the items seized from defendant's room were a lease for the locker where the ammonium nitrate was stored, Cecil Brown's phone number, a certified copy of defendant's 2002 counterfeiting conviction, a receipt from a paper store, paper (for the counterfeit money), a paper cutter and computer which was probably used in creating the counterfeit currency.

## DISCUSSION

Defendant seeks judgment of acquittal under Fed.R.Crim.P. 29. A judgment of acquittal is proper only when there is insufficient evidence to sustain the jury's findings. *United States v. O'Hara*, 301

F.3d 563, 569 (7th Cir.2002). The question is whether the record contains evidence on which a rational jury could have returned a guilty verdict. Under Rule 29, the trial judge does not become the "thirteenth juror." *United States v. Genova,* 333 F.3d 750, 757 (7th Cir.2003), but if I were, I would have voted the same way the jury did on the counts of conviction.

■ As to the first two counts of the indictment, the defendant seeks a judgment of acquittal claiming that the government failed to prove that he had the "specific" intent to damage or destroy the Dirksen Federal Building and that the government did not prove that he took "a substantial step toward" committing the offenses. Defendant's argument on each contention is that the evidence only showed that he had "a general intent to purchase and resell certain chemicals." (Defense Motion, October 14, 2005, page 2).

Defendants' statements to Cecil Brown, Beasley, Anicua and "Ali," as outlined above, defeat this argument as to intent. They, plus his actions, evinced a clear intent to blow up the Dirksen Building. The actions, taken together, included substantial steps to accomplish the destruction of the Dirksen Building.

The defendant accepted 500 pounds of "ammonium nitrate" at his rented storage space. He took this with the specific intent to combine that fertilizer with a fuel to create an explosive device that he would use to damage or destroy the Dirksen Federal Building. What defendant intended on doing with this fertilizer—destroying the Dirksen Federal Building—was indisputably proven based on the tapes that the government introduced and the other proof in the case. Acceptance of the fertilizer in the context of the proof here was a substantial step towards blowing-up the Federal Courthouse.

Viewing the evidence in the light most favorable to the government, as I must, *see O'Hara,* 301 F.3d at 569–70, I find that the record contains more than sufficient evidence to approve the jury's findings that defendant took a substantial step and that he had the specific intent to damage or destroy the Dirksen Federal Building.

■ Defendant seeks a judgment of acquittal on Counts 4 through 9 because he claims that there was insufficient evidence to show that he had the intent to defraud when he sold the counterfeit currency. Defendant contends that he "is heard on tape recorded conversation[s] telling the purchasers of the allegedly counterfeit bills that they are unlikely to be successfully passed as true United States currency." (Defense Motion at ¶ 4(b), page 2). Such is not the case.

The tapes played at trial showed that defendant believed that the counterfeit bills he supplied to Anicua would be sent to Mexico. They were to be exchanged there for pesos and shipped back into the United States. There was a clear intent to defraud with respect to that counterfeit money. As to the counterfeit sent to Beasley, defendant told Anicua that Beasley was "wholesaling" this currency. This shows that defendant believed that Beasley was selling the counterfeit currency to others. Defendant took great efforts to make sure that the counterfeit was of high quality. He sold the counterfeit at a price of about twenty percent of its face value. Accepting the evidence in the light most favorable to the government, I conclude that the record contains more than sufficient proof to support the jury's finding that defendant had the intent to defraud with respect to Counts 4 through 9.

Defendant argues that he is entitled to an acquittal because the government's evidence established as a matter of law that he was entrapped. This is simply not so.

There was ample evidence to support the jury's finding that there was no entrapment.

■ The proof demonstrated that defendant was predisposed to committing the crimes for which he was convicted. In deciding if a defendant was (or was not) predisposed to commit a crime, the following are relevant: (1) the defendant's character or reputation; (2) whether law enforcement officers initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether defendant showed a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *United States v. Higham,* 98 F.3d 285, 291 (7th Cir.1996).

■ As to Counts 1 and 2, defendant's character and reputation show that he was predisposed to committing the offenses. Mr. Nettles had knowledge regarding explosives. He also has a deep hatred for the federal government in general and federal judges in particular. He articulated his desire to have a high number of casualties when the bomb was detonated. He believed that the number of people killed during 9/11 terrorist attacks was "low." He used the nickname "Ben Laden" both in and out of prison. Clearly, there was a predisposition to commit the crimes charged in Counts 1 and 2. He raised the whole subject with Cecil Brown in the first place.

With respect to Counts 1 and 2, defendant told Cecil Brown about his plan to bomb the Dirksen Federal Building while they were inmates at Yazoo City FCI. This was before any federal agent came into contact with Mr. Nettles. Defendant drew a diagram of the Dirksen Federal Building in the sand while describing the plan (page 5, *supra* ). On November 13 and 14, 2003, defendant placed telephone calls to the undercover F.B.I. number that Brown had given him. Defendant asked Anicua if she knew any associates of Hamas or al Qaeda without any provocation, urging or leading on her part.

■ Concerning the counterfeiting charges in Counts 4 through 9, defendant was charged on October 24, 2000 in this District with manufacturing counterfeit currency and was convicted of this crime. He was on supervised release when he committed the offenses charged in this indictment. The earlier counterfeiting conviction shows his predisposition to counterfeit money. So, too, do his statements to Beasley that he is "into graphic art" that he "makes money the old fashioned way" by "printing it." At their first meeting, defendant asked Beasley whether he "could use some bogus money." Mr. Nettles devoted considerable time and effort to be able to print the counterfeit money. In her dealings with defendant, Anicua did not raise the subject of counterfeiting—defendant did.

Defendant sought to make sure that his acquisition and sale of the fertilizer was profitable. He bought two tons of it from Beasley for $9,000 in counterfeit. He sold a portion of the fertilizer to "Ali" for $10,000 in legitimate currency. He tried to short change Beasley by telling him that "Ali" was to purchase the fertilizer for $5,000 (instead of $10,000) and offering him $3,000 for providing defendant with the fertilizer. Defendant's exchange with Beasley would allow him to keep half a ton of the fertilizer for himself and make a $7,000 profit from his deal with "Ali." What he provided in return was $9,000 in counterfeit bills to Beasley. Defendant's intended use of the fertilizer would have avenged his counterfeiting conviction in his mind.

The manufacture and sale of the counterfeit money was profitable to defendant.

He provided Anicua with a total of $58,040 of counterfeit bills in exchange for $11,100 in real U.S. Currency. He netted $6,100 for this counterfeiting work.

The jury listened to many hours of conversations in which defendant participated. Except for some hesitancy expressed because at first he did not trust "Ali," defendant did not show a reluctance to commit any of the crimes for which he was convicted.

It was the defendant who first mentioned his criminal conduct. The civilians and federal agents listened to defendant. They assisted him when he needed help, and purchased the counterfeit and fertilizer from defendant when he offered them. The evidence showed that defendant was the genesis of the criminal activity and the one making the decisive calls. He had no reluctance to commit the crimes charged.

Profits that defendant made were a result of his dealings. He was the one who tried to get a member of al Qaeda or Hamas to purchase the fertilizer from him. Defendant initially suggested $15,000 for the half-ton. He later agreed to $10,000. On his counterfeiting, defendant set the price of twenty to thirty percent of the total face value of the counterfeit money. He took less than twenty percent on the bills that he sold to the purported friend of Anicua. Including the money he gave to Anicua as her share of the transaction, defendant received less than ten percent of the face value of the counterfeit bills. The Government did not entrap or entice him by offering large sums of money. There was no inducement or persuasion by Government authorities.

There was more than sufficient evidence for the jury to find that the defendant was not entrapped into committing the offenses. Defendant's motion for a judgment of acquittal on that ground is denied.

Defendant also claims that the Court committed several errors that now require him to receive a new trial.

■ First, defendant claims that this court erred in denying his motion to transfer the proceedings. Fed.R.Crim.P. 21 provides that venue of a trial shall be transferred to another district if there exists in the original district "so great a prejudice against the defendant" such that the defendant "cannot obtain a fair and impartial trial" in that district. Jury selection demonstrated beyond any doubt that it was unnecessary to transfer the proceedings. Few, if any, potential jurors had heard of defendant or the case. There simply was not the type of pre-trial publicity that would cause a need for this case to be transferred, nor was there that much media coverage during trial. Nothing indicated that defendant could not and did not receive a fair and impartial trial here. Defendant's concerns regarding the potential impartiality of jurors were adequately addressed during the voir dire process.

■ Defendant further claims error because he was denied a severance of counts. The counts alleged in the indictment were properly joined and the trial was appropriately held on the nine counts together (see my decision of August 16, 2005 at pages 4–5). Fed.R.Crim.P. 8(a) permits the joinder of multiple offenses "if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two more actions or transactions connected together or constituting parts of a common scheme or plan." Rule 8(a) "leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *United States v. Moore,* 115 F.3d 1348, 1362 (7th Cir.1997) (quoting *Zafiro v. United States,* 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)).

There was no need to sever because defendant's counterfeiting efforts were part of the common scheme and plan to destroy the Dirksen Federal Building with a truck bomb. The proof at trial was that the counterfeiting would finance the bomb plot. It was during his dealings with Sylvia Anicua, who was purchasing counterfeit money from defendant, that he asked her if she knew anyone affiliated with al Qaeda or Hamas. Defendant sold ammonium nitrate fertilizer to a purported al Qaeda terrorist to whom he was introduced by Ms. Anicua. The plot to destroy the Dirksen Building and to counterfeit were intimately connected. They were joined at the hip. There are no circumstances here which justify the inefficiencies of conducting more than one trial.

█ Mr. Nettles also seeks a new trial because the Court allegedly erred in denying his motion for judgment of acquittal before the jury returned its verdict. For the same reasons that judgment of acquittal is not appropriate, a new trial is equally inappropriate.

Defendant argues that there was error because the jury was instructed not to consider punishment (Instruction Number 40) in reaching a verdict.*

Defendant does not argue that the instruction about punishment was an inappropriate statement of the law or that the jury should in any way consider punishment. Defendant's objection is only that it is not a pattern jury instruction. Judges routinely provide juries with instructions that are not pattern jury instructions. Judges routinely provide the same or a similar jury instruction, both in the Seventh Circuit and throughout the nation, as the one about which defendant now complains. Defendant has not pointed to any prejudice suffered as a result of this in-

struction. This does not create grounds for a new trial.

Finally, defendant argues that the Court erred in overruling the defense objections to certain portions of the testimony of the witness, Michael Leone. Defendant does not specifically point to which objections were overruled and which portions of Mr. Leone's testimony he claims were speculative, prejudicial, and not relevant. In any event, all of the Leone testimony was appropriate and no error was committed with respect to Leone's testimony.

Defendant's motions are denied in all respects. Sentence will be imposed on January 12, 2006 at 10:00 A.M.

SO ORDERED.

---

\* The Court's clear recollection is that defense counsel withdrew this objection to this part of the charge. But, if my recollection is wrong, I am ruling on this argument on the merits.