UNITED STATES of America,
Plaintiff–Appellee,

v.

James W. BLASSINGAME and Thomas S. Fuller, Defendants–Appellants.

Nos. 98–3358, 98–3603.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1999.

Decided Nov. 23, 1999.

Morris Pasqual, Office of the United States Attorney, Criminal Division, Chicago, IL, Christopher Tracy (argued), Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Rick Halprin, Chicago, IL, for Defendant–Appellant Blassingame.

James D. Montgomery (argued), Montgomery & Associates, Chicago, IL, for Defendant–Appellant Fuller.

Before POSNER, Chief Judge, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Co–Defendant Thomas S. Fuller ("Fuller") pled guilty to two counts of fraud and filing false statements in violation of 26 U.S.C. § 7206, and was convicted of one count of racketeering in violation of 18 U.S.C. § 1962(d), four counts of interference with commerce by threats or violence in violation of 18 U.S.C. § 951, two counts of theft or bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a) (1)(B), and three counts of frauds and swindles in violation of 18 U.S.C. §§ 2, 1341. In the same trial, co-Defendant James W. Blassingame ("Blassingame") was convicted of one count of racketeering in violation of 18 U.S.C. § 1962(d), eight counts of extortion under color of official right in violation of 18 U.S.C. § 1951, three counts of bribery in violation of 18 U.S.C. § 666(a)(1)(B), and three counts of mail fraud in violation of 18 U.S.C. § 1341.

Prior to trial, the district court asked Fuller to proffer evidence in support of his entrapment defense. When he declined to submit a proffer, the trial judge ruled that Fuller's entrapment defense would be excluded from the trial until and unless he made a sufficient showing of entrapment. At the conclusion of the trial, the court declined to issue an entrapment instruction to the jury. The court also denied Fuller's motion for acquittal based on entrapment, motion for acquittal based on insufficient evidence and motion to suppress the testimony of the government informant. Fuller now appeals these decisions. Blassin-

game appeals the trial judge's denial of his motion for severance. We AFFIRM.

# I. BACKGROUND

Using information provided by confidential informant John Christopher, a.k.a. John DiVito ("Christopher"), in July 1992, the Federal Bureau of Investigation ("F.B.I.") initiated "Operation Silver Shovel." Christopher provided the F.B.I. with information regarding corrupt public officials and, in particular, Defendant Blassingame. Christopher described Blassingame as the "classic bagman" who collected and distributed bribes to public officials. The investigation of Blassingame led to the F.B.I.'s investigation of Defendant Fuller.

Beginning in 1978, Fuller was elected to three six-year terms on the Board of Commissioners of the Metropolitan Water Reclamation District of Greater Chicago ("Water Reclamation District"). In January 1993, Fuller became the top-ranking official at the Water Reclamation District as president of the board of commissioners. As president, Fuller held substantial authority over the Water Reclamation District, which owned land suitable for trash recycling and frequently contracted out construction and excavation work. During that time, Christopher employed Blassingame as a political consultant and lobbyist. From June 1992 through August 1994, Fuller, Blassingame and James Gardner ("Gardner"), a Water Reclamation District commissioner who died prior to the filing of the indictment, engaged in three incidents where Fuller and Gardner accepted cash bribes in exchange for acts in their respective official capacities with the Water Reclamation District. Fuller and Gardner received these bribes from Christopher and undercover F.B.I. Special Agent Mark Sofia ("Agent Sofia").

## A. The Skokie Project

On June 30, 1992, the Water Reclamation District informed the joint venture of Wil–Freds/Racine ("Wil–Freds") that, as the low bidder, it was awarded the construction contract for work at the Skokie and Hanover Park, Illinois sewage treatment plants ("Skokie Project"). As a consultant for Christopher's excavation and hauling company, Marlboro, Inc. ("Marlboro"), in late June or early July 1992, Blassingame informed Christopher of the Skokie Project and offered to arrange for Marlboro to receive the project's excavation subcontract. Blassingame also informed Christopher that the subcontract could be worth about $800,000, at which time Christopher indicated that he was willing to pay up to two percent of the subcontract price, or $16,000, to procure the subcontract.

In mid-July 1992, Blassingame and Christopher met with Gardner at Gardner's office. During the meeting, Gardner confirmed that he would help Marlboro procure the subcontract and phoned the president of Wil–Freds, Bill Luxion ("Luxion"), to arrange a meeting for July 28, 1992. On July 23, 1992, Blassingame and Christopher met at Mother's Day Restaurant in Berwyn, Illinois. Blassingame stated that Fuller had become aware of the Wil–Freds subcontract deal and should receive $2,000 while Gardner should receive $14,000.

As scheduled, on July 28, 1992, Gardner met with Luxion, Blassingame and Christopher in his office. Gardner asked Luxion to award the excavation subcontract on the Skokie Project to Marlboro. Luxion responded that he would consider Marlboro for the subcontract, but indicated that Marlboro had to submit a bid to Wil–Freds. On August 4, 1992, Wil–Freds awarded the subcontract to Marlboro as the low bidder for $635,000. Because the subcontract was awarded for $165,000 less than what was expected, Christopher told Blassingame that he was willing to pay only $14,000 to Fuller and Gardner.

On September 10, 1992, a majority of the full board of the Water Reclamation District voted to approve Wil–Freds as the

contractor for the Skokie Project. Fuller voted in favor of awarding the contract to Wil–Freds while Gardner abstained, citing without further explanation, a "potential conflict." On October 3, 1992, Marlboro received a proposed excavation subcontract, which it signed and returned. Around the same time, Blassingame gave Christopher new instructions on how to allocate the bribe money: $4,000 to Fuller and $10,000 to Gardner.

Three weeks later, on October 24, 1992, Christopher paid $2,000 cash to Gardner. For work done for Marlboro, Christopher also handed $1,000 cash to Gardner to pass on to Blassingame who was out of town. Gardner and Christopher also agreed on dividing the total bribe at $4,000 for Fuller and $10,000 for Gardner.

Christopher telephoned Fuller on December 15 and 16, 1992, to arrange a meeting for payment of the bribe. On December 16, 1992, Christopher picked Fuller up in the garage of the Water Reclamation District and then drove to Jaxx's Restaurant. There, Christopher gave Fuller a closed cigarette pack containing 40 $100 bills, totaling $4,000.

Six days later on December 22, 1992, Christopher met Blassingame and Gardner at Peapod's Restaurant and gave Blassingame $2,000 which he in turn gave to Gardner. On February 25, 1993, Christopher twice spoke to Blassingame to arrange another meeting for payment of the bribe. At Blassingame's suggestion, later that day, Christopher paid Gardner $2,000 and Blassingame $2,000.

On May 3, 1993, Christopher made the last bribe payment in relation to the Skokie Project subcontract. Christopher met Blassingame and Gardner at Mother's Day Restaurant to pay the last $4,000 installment. Because of a mistake in counting the money, Christopher only brought 39 $100 bills. Nonetheless, Christopher paid Blassingame $3,900 which in turn was passed on to Gardner.

## B. Teka Construction

On February 11, 1994, Blassingame, Gardner, Christopher and Agent Sofia met at Edna's Restaurant in Chicago. Christopher introduced Agent Sofia as one of his business executives. The purpose of the meeting was to discuss one of Christopher's companies, Teka Construction ("Teka"), and its application for Minority Business Enterprise ("MBE") status with the Water Reclamation District. As a MBE company, Teka would be placed on a special list of suppliers hired by the Water Reclamation District. During the meeting, Gardner agreed to assist Teka. Simultaneously, Blassingame expressed concern about Gardner's re-election campaign and asserted that the campaign could use a contribution of $10,000, which Christopher and Agent Sofia agreed to pay.

Six days later on February 17, 1994, Blassingame, Gardner, Christopher and Agent Sofia again met when Agent Sofia gave Blassingame $10,000, which in turn was passed on to Gardner. The next day, Agent Sofia met Blassingame and Gardner in Gardner's office. There, Gardner gave Agent Sofia a blank MBE application and said, "Now when you fill these forms out, if you get them back to us . . . I'll personally walk them over." On March 2, 1994, Agent Sofia delivered a completed MBE application to Gardner. Six days later on March 8, 1994, Blassingame informed Agent Sofia that Gardner was "pushing that stuff through yesterday." The Water Reclamation District approved Teka's MBE application in March 1994.

## C. Land Permit

In April 1994, Christopher and Agent Sofia informed Blassingame that they wanted to use a parcel of the Water Reclamation District's land as a site for rock crushing and recycling. They told Blassingame that they planned to truck concrete, asphalt and other construction debris to the site and set up a "rock crusher" machine. By practice, private companies could rent Water Reclamation District

land. The Water Reclamation District's real estate division of the law department reviews each permit request, coordinates its technical review, communicates the conditions of the proposed permit with the applicant and makes a recommendation to the general superintendent. Should the general superintendent concur with the real estate division's recommendations, the permit request is forwarded to the board of commissioners for a vote.

On April 14, 1994, Blassingame met with Christopher and Sofia to review various maps of vacant parcels of land owned by the Water Reclamation District. They agreed on a 17 acre parcel numbered 40.04. Christopher instructed Blassingame, "Whatever is takes, tell us who gets what and I need it done now." Five days later on April 19, Blassingame met with Fuller at his office to discuss Christopher's permit application. At the meeting, Fuller agreed to assist. Later that day, Blassingame called Agent Sofia on two separate occasions to discuss the permit and asked him to prepare a permit request letter to Fuller because on any "lease or any permit, [Fuller has to] sign off on it first."

That evening, Blassingame called Christopher and informed him that nobody else would get the parcel of land he was interested in. In response, Christopher asked how much of a bribe he would have to pay:

Christopher: I'll sit down with you alone, okay? Because I have to go get it. You follow me?

Blassingame: Mmm-hmm.

Christopher: I wanna sit it down and do whatever I have to do.

Blassingame: Okay.

Christopher: Okay? Because I already know the play down there. . . .

. . .

Christopher: . . . okay? Give me some numbers. That's all I need.

. . .

Blassingame: I already got them numbers.

Christopher: You already got them numbers . . .

Blassingame: Yeah.

Christopher: . . . from him?

Blassingame: That's why I say we need to talk.

Christopher: Okay. I'll talk to ya alone and I'll call ya later tomorrow.

Three days later on April 22, 1994, Blassingame and Christopher met to discuss the specifics of the bribe. In return for their assistance, Christopher agreed to pay Gardner $10,000, Fuller $5,000 and Blassingame $35,000 plus $5.00 per load of debris.

Agent Sofia delivered a completed permit application to the Water Reclamation District on April 21, 1994. The application was addressed to Fuller, who routed it to Frank Dalton, general superintendent of the district. Maureen Whelan ("Whelan"), an attorney in the real estate division, was assigned to review the permit request. Her review revealed that parcel 40.04 was partially used by both the Water Reclamation District and Northern Illinois Gas. Accordingly, Whelan prepared a letter dated May 5, 1994, describing the problems with the parcel and setting out a rental fee. While preparing the letter, Fuller summoned Whelan to his office to discuss the status of the permit application. Later, Fuller arranged to have the letter delivered to his office for hand pickup by Christopher.

On May 4, 1994, Fuller met with Blassingame and Agent Sofia at Marche Restaurant in Chicago. Fuller told Agent Sofia that although there were a few problems with the permit application, if Agent Sofia revised the permit request and "get it back to us[,] . . . . [t]he next board meeting we'll have it ready." The next day, Fuller asked Christopher to come by his office and pick up the Whelan letter. There, Christopher gave Fuller $5,000 cash in a McDonald's bag. Fuller accepted the money after initially responding, "That's not necessary, John."

Fuller and Christopher also discussed Christopher's record of dumping and leaving debris on public property. Fuller told Christopher that "[w]e don't want you to leave what we'd consider a . . . . mountain there."

On May 10, 1994, Fuller, Blassingame and Christopher met at Chez Paul Restaurant to discuss potential problems with the permit due to Marlboro's dumping history. Nine days later on May 19, 1994, Christopher, Fuller and Blassingame again met at Chez Paul, this time without Agent Sofia. There, Fuller expressed his discomfort with Agent Sofia: "I don't even know this man. . . . A man becomes very generous and I get nervous. . . . Hey, get very nervous." Fuller also told Christopher that "I'm gonna get you it, help you get a permit. After that, I'm through."

On June 3, 1994, Blassingame called Agent Sofia for an advance of $2,000 as "a little financial help to hold me over while I'm working on this stuff." Agent Sofia agreed and paid him $2,000 cash the next day. Four days later, Agent Sofia and Blassingame were meeting at Chez Paul Restaurant when Fuller unexpectedly arrived and told Agent Sofia that "I'm very uncomfortable with you. . . . I'll tell you straight up . . . I don't know you. I don't know where you're from or anything. . . ."

Later that month on June 27, 1994, an article appeared in the Sun–Times that linked Christopher and Marlboro to an abandoned dump on Roosevelt Road in Chicago. After reading the article, Whelan informed the general superintendent who concurred with her in recommending against issuing a permit to Marlboro. By a letter dated August 8, 1994, Whelan informed Marlboro that its permit request had been denied.

After the undercover phase of the investigation was completed, F.B.I. Special Agents interviewed Fuller on January 5, 1996. After initially denying that he received cash from Christopher, Fuller admitted that he received from Christopher a cigarette pack containing $100 bills and an envelope containing $100 bills. Fuller told the agents, "I understand that I committed a crime."

On June 17, 1997, the grand jury returned an indictment against both Fuller and Blassingame which they both pled not guilty to on all counts at their July 7, 1997 arraignment. In response to the government's January 21, 1998 motion *in limine* to exclude the entrapment defense from trial, on February 12, 1998, the trial judge denied the motion but ruled that Fuller's entrapment defense would be excluded from the trial until and unless he made a sufficient showing of entrapment. On February 18, 1998, the day before opening statements, Fuller withdrew his not guilty plea to the fraud and filing false statements counts. During trial, Blassingame made a motion for severance, which the court denied on February 28, 1998.

At the conclusion of a two-week trial, a jury convicted Fuller on all remaining counts of racketeering, interference with commerce by threats or violence, theft or bribery, and frauds and swindles. The jury also convicted Blassingame on all counts of racketeering, extortion, bribery and mail fraud. On May 13, 1998, the district court denied Fuller's post-trial motions for acquittal based on entrapment and lack of evidence and denied his motion to reconsider on May 29, 1998. On June 3, 1998, the court denied Blassingame's motion for a new trial and on August 4, 1998, denied Fuller's post-trial motion to suppress the testimony of John Christopher.

On October 8, 1998, the district court sentenced both Fuller and Blassingame to thirty-seven months imprisonment followed by three months probation and fined both Defendants. Both Defendants filed a timely notice of appeal challenging their convictions and sentences.

## II. ISSUES

Defendants argue on appeal that the district court committed reversible error when it: (1) required Defendant

Fuller to proffer entrapment evidence; (2) refused to allow Fuller to present an entrapment defense during opening argument and issue entrapment jury instructions; (3) denied Fuller's motions for judgment of acquittal based on entrapment and insufficient evidence; (5) denied Fuller's motion to suppress the testimony of informant John Christopher; and (6) denied Defendant Blassingame's motion for severance.

## III. DISCUSSION

### A. Defendant Fuller's Entrapment Defense

#### 1. Proffer of Entrapment Evidence

 Defendant Fuller contends that the trial judge's decision to require a proffer of entrapment evidence was not supported by legal authority. It is well established that " '[f]or a defendant to raise the entrapment defense, he or she must, produce evidence of both the Government's inducement and his own lack of predisposition.' " *United States v. Teague*, 956 F.2d 1427, 1434 (7th Cir.1992) (quoting *United States v. Carrasco*, 887 F.2d 794, 814 (7th. Cir.1989)). Indeed,

> [a]s a *prerequisite* for presenting the defense of entrapment to the jury, the defendant must produce sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crime charged. Only if a defendant meets this threshold burden is he entitled to present the question of entrapment to the jury for resolution.

*United States v. Santiago–Godinez*, 12 F.3d 722, 727 (7th Cir.1993) (emphasis added).

On January 21, 1998, the government filed a motion *in limine* to bar Defendant Fuller's entrapment defense from trial. The government argued that Defendant Fuller could not set forth sufficient *prima facie* evidence to demonstrate a viable entrapment issue. In response to the motion, for reasons unexplained in the record, Defendant Fuller declined to make a proffer of entrapment evidence. (Tr. at 3–4.)

 The trial court was required to accept "evidence proffered in response to a motion *in limine*" to determine its sufficiency as a matter of law to support an entrapment defense. *See Santiago–Godinez*, 12 F.3d at 727. However, because of Defendant Fuller's failure to proffer entrapment evidence, the court could have appropriately found that his response to the motion *in limine* was "insufficient as a matter of law" and issued "a pretrial ruling precluding the presentation of the defense at trial." *Id.*; *see U.S. v. Johnson*, 32 F.3d 304, 307 (7th Cir.1994). Nevertheless, the district court rejected the government's motion to bar the entrapment defense, but ruled that entrapment could not be argued to the jury until and unless, as a prerequisite, a proffer or showing of sufficient evidence was made. (Tr. at 3–4.)[1] Because the trial judge left the door open for Fuller to make a showing of entrapment evidence, which Fuller declined to do, we hold that the trial court's ruling in requiring Defendant Fuller to satisfy his evidentiary "prerequisite for presenting the defense of entrapment to the jury" was proper. *Santiago–Godinez*, 12 F.3d at 727.[2]

---

1. In support of barring the entrapment defense from Fuller's opening statement, the district court cited *United States v. Finley*, 708 F.Supp. 906, 914 (N.D.Ill.1989), which found:
 Here, the government seeks not a pretrial determination of whether an entrapment defense is available, but only an assurance that defense counsel will not argue entrapment to the jury unless and until sufficient evidence has been presented to create a jury question as to entrapment. The government's position is in accord with the

 case law, and its motion is granted. (Argument concerning entrapment is thus not to be included in any opening statements which are made before the government puts on its case.)

2. Defendant Fuller also argues that the trial judge's ruling violated the due process clause of the Fifth Amendment in light of *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). *Wardius* held that requiring a notice of alibi defense prior to trial,

■ Further, conduct of a trial and its direction are subject to the sound discretion of the trial court. *See United States v. Doyle*, 121 F.3d 1078, 1093 (7th Cir. 1997). Absent manifest abuse, a district court has wide discretion over the scheduling and administration of a trial. *See United States v. Murvine*, 743 F.2d 511, 514 (7th Cir.1984). Again, the trial judge did not foreclose Defendant Fuller from making an entrapment defense. Instead, the court limited the scope of the trial by excluding the defense until such time Fuller made a sufficient showing or proffer of entrapment. Accordingly, we are of the opinion that there was no abuse in the trial court's administration of its trial and hold that there exists substantial legal authority to support the court's decision to require a sufficient proffer or showing of entrapment evidence before such defense may be presented to the jury.[3]

### 2. Exclusion of Entrapment Defense From Trial and the Jury Instructions

■ Defendant Fuller argues that the trial court committed reversible error by excluding his entrapment defense from trial and the jury instructions. Because the legal sufficiency of a proffered entrapment defense is a question of law, *see Santiago–Godinez*, 12 F.3d at 726, we review the district court's ruling to exclude an entrapment defense *de novo*. *See United States v. Neville*, 82 F.3d 750, 760 (7th Cir.1996); *Santiago–Godinez*, 12 F.3d at 726.

■ It is well established in this circuit that "'if the evidence was such that a rational jury could have inferred that he was entrapped into committing the crime of which he was convicted, he was entitled to present the defense of entrapment to the jury.'" *Teague*, 956 F.2d at 1434 (quoting *United States v. Evans*, 924 F.2d 714, 716 (7th Cir.1991)). A defendant's initial burden "requires presenting more than a scintilla of evidence," although it need "not be so substantial that if uncontroverted, a court may find entrapment as matter of law." *Santiago–Godinez*, 12 F.3d at 727–28 (citation omitted).

The entrapment defense requires proof of two elements: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *Santiago–Godinez*, 12 F.3d at 728. Once the defendant establishes both, the burden shifts to the government, which can defeat the entrapment defense by proving beyond a reasonable doubt either that the defendant was predisposed to commit the offense or the absence of government inducement. *Santiago–Godinez*, 12 F.3d at 722.

■ Predisposition is the principal element of the defendant's initial burden of the entrapment defense. *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Evans*, 924 F.2d at 717. "Predisposition ... focuses upon whether the defendant was an 'unwary

without providing for reciprocal discovery, violates due process. *See id.* at 477, 93 S.Ct. 2208. However, unlike an alibi, entrapment is an affirmative defense and it is well established that some minimal showing is required to entitle a defendant to maintain an affirmative defense. *See United States v. Bailey*, 444 U.S. 394, 415–417, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980); *Santiago–Godinez*, 12 F.3d at 727. Thus, we hold that *Wardius* is inapplicable and reject Defendant Fuller's Fifth Amendment due process claim.

3. At trial, Defendant Fuller attempted to make a distinction between when "presenting" and "arguing" to a jury occurs. (Tr. at 6.) While he agreed that there must be sufficient initial evidence of entrapment before the entrapment defense may be argued to the jury, he appears to suggest that "arguing" occurs at the end of trial after all the evidence is in, thus allowing for presentation of the defense during the opening statement. (*Id.*) We hold that there is no merit to Fuller's distinction because subscribing to it would render a pretrial motion *in limine* to bar an entrapment defense futile, which is plainly contrary to existing law.

innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime...." *Mathews*, 485 U.S. at 63, 108 S.Ct. 883 (citations omitted). If there is sufficient evidence of Defendant's predisposition to commit the crime, the trial court may reject the entrapment defense and prohibit the defendant "from raising the ... defense at trial" without inquiry into the government inducement factor. *Johnson*, 32 F.3d at 308; *Santiago–Godinez*, 12 F.3d at 728; *United States v. Sanchez*, 984 F.2d 769, 773 (7th Cir.1993).

As previously discussed, Fuller failed to make a proffer in response to the government's pre-trial motion. Thus, we review the evidence of his predisposition to commit the crimes presented at trial.

In determining predisposition, this circuit typically considers five factors: (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government. See *United States v. Higham*, 98 F.3d 285, 290 (7th Cir.1996); *United States v. Theodosopoulos*, 48 F.3d 1438, 1444–45 (7th Cir. 1995); *United States v. Cervante*, 958 F.2d 175, 179 (7th Cir.1992); *United States v. Blackman*, 950 F.2d 420, 423 (7th Cir. 1991).

Of these, "the most important factor ... is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement." *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir.1983) (quotation and citation omitted).

A person who takes advantage of an ordinary opportunity to commit criminal acts—not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person—is not entrapped. Such a person is predisposed to crime in the sense that the ordinary profits of crime are incentive enough to him to commit crimes; he is ready and waiting; all that is wanting is the opportunity.

*Evans*, 924 F.2d at 717.

### (a) Defendant Fuller's Reluctance

▮ In connection with the Skokie Project, Defendant Fuller had two separate phone conversations to arrange for payment of the bribe. The first conversation occurred on December 16, 1992:

Christopher: I'm doin' alright. I'm going to the bank right now.

Fuller: Um-mm

Christopher: On that job out in uh, in Skokie?

Fuller: Uh huh.

Christopher: Uh, take me about a day. What time tomorrow to take care of that?

Fuller: Anytime tomorrow, you just, I'll tell ya what, I'm gonna be outa the office between twelve and three thirty tomorrow.

Christopher: Okay, you wanna do it about four o'clock?

Fuller: Four o'clock you got it. I'll see ya four o'clock tomorrow.

Christopher: Where at?

Fuller: Just call me when you get, we'll meet some place.

Christopher: Yeah, that, maybe up by that place for wine or something.

Fuller: Right, right, call me at four o'clock and we'll meet.

Christopher: That's between you and I right?

Fuller: Right, that is correct.

(Tr. 264, Ex. 12/15/92 at 1.)

The next day, they spoke again:

Christopher: I just left the bank.

Fuller: Mmm hmm.

Christopher: When am I, uh, I'm in my boots so where do you wanna....

Fuller: You wanna come to my office or you wanna . . .

Christopher: Oh, I'm not coming in there.

Fuller: Okay.

Christopher: I'll park my car underneath the thing, if you could call 'em and tell 'em.

Fuller: Okay.

(Tr. at 267, Ex. 12/16/92 A at 1.)

Upon arriving at the garage, Christopher picked up Fuller and drove to Jaxx's Restaurant on Michigan Avenue. (Tr. at 267.) Inside, Christopher slid Fuller a cigarette pack containing 40 $100 bills across the restaurant table. (Tr. at 267–71, 415, 421, 893–913; Ex. 12/16/92 B at 9.) Fuller later admitted to the bribe when questioned by F.B.I. agents on January 5, 1996. Agent Davis testified that Fuller said that "[h]e took the money and put it in his pocket. When he got home, [he] put it in a drawer and took money out as he needed it." (Tr. at 795.) Agent Davis also testified that Fuller said that he "thought that DiVito had given him the money because he wanted . . . [me to use my] influence as a commissioner at the water reclamation district to help him in his efforts to operate dump sites." (*Id.* at 795–96.)[4] Defendant Fuller's actions, which include arranging a meeting time and place and retaining the $4,000 bribe, demonstrate no reluctance to engage in the criminal activity.

In connection with Marlboro's land permit application, Fuller arranged to have the Whelan letter describing the rental fee for parcel 40.04 delivered to his office for hand pick-up by Christopher. On May 5, 1994, Christopher met Fuller in his office to discuss the letter. During their conversation, Christopher gave Fuller $5,000 inside a McDonald's bag:

Christopher: Here, here's 5. Here's 5 and anything. That's 5.

Fuller: That's not necessary John.

Christopher: Well, that's 5 for this okay. Thank you. There's more whatever it is let me know.

(Tr. 317–19, Ex. 5/5/94 B at 7.)

Without additional protest, Fuller accepted the money. (*Id.*) Fuller later admitted that he received the May 5, 1994 bribe. Agent Davis testified, "The second set of money, he [Fuller] told me that he just spent it as he needed it. I asked him if he'd ever used the money in his trips to Jamaica and he said he probably had." (Tr. at 798.) Fuller also said that "Christopher was paying . . . [me] because he wanted . . . [me to use my] influence as president of the water reclamation district to help him, A, with this lease application, and, B, in getting property, other property for dumping," testified Agent Davis. (*Id.*) Again, Fuller's actions before, during and after the bribe demonstrate no reluctance on his part to engage in the bribery scheme. Further, the statement, "That's not necessary John," is at best a polite gesture on Fuller's part and does not indicate a reluctance to engage in the crime in light of his numerous other actions relating to the bribe.

### (b) Nature of Government Inducement or Persuasion

 Often considered in conjunction with the reluctance of the defendant to engage in the criminal activity is the nature of the government inducement or persuasion presented to the defendant. *See Santiago–Godinez*, 12 F.3d at 728. Defendant Fuller argues that the government's inducement was substantial because the thousands of dollars given to him in exchange for nothing in return constituted an "extraordinary opportunity" and the gov-

---

4. Defendant Fuller argues that he considered Christopher's December 16, 1992 $4,000 bribe a Christmas gift. We find this argument implausible, especially in light of Agent Davis's testimony: "[Fuller] said at the time that he thought it was a Christmas gift, but also said that he knew that it was Christopher's intention to give him money to win his favor basically and get President Fuller to help him find land." (Tr. at 796.)

ernment exploited his friendship with Blassingame.

On December 16, 1992, Fuller was paid $4,000 for his assistance in procuring an excavation subcontract, and on May 5, 1994, $5,000 for his assistance in securing a land permit. Indeed, government sting operations typically involve some type of monetary bait. However, Fuller's case is plainly inapposite from the situation where a "police officer offer[s] a derelict $100,000 to commit a minor crime that he wouldn't have dreamed of committing." *See Evans*, 924 F.2d at 717. Further, Fuller fully understood that there was an expectation that he would use his influence as president of the Water Reclamation District to assist Christopher. Nor are we persuaded by Defendant Fuller's argument that the $4,000 and $5,000 bribe payments were "extraordinary" because he received the money for nothing in return. As president of the Water Reclamation District, Fuller had substantial influence over its bureaucracy. With full knowledge of Christopher's intentions, Fuller, at a minimum, discussed Water Reclamation District business, provided advance information, exerted influence, held meetings, and made inquiries on Christopher's behalf. Accordingly, because of Fuller's actual assistance and Christopher's expectation of assistance which Fuller was well aware of, we do not find bribes of $4,000 and $5,000 "extraordinary."

Regarding Fuller's claim that the government exploited his friendship with Blassingame, Blassingame's role as the "classic bagman" for corrupt public officials existed prior to the government sting operation. Also, both Fuller and Blassingame individually arranged for and received bribes from Christopher; indeed, both co-Defendants were "willing to swallow the government's bait." *See United States v. Hollingsworth*, 27 F.3d 1196, 1205 (7th Cir. 1994) (Coffey, J., dissenting).

Further, on December 16, 1999, Fuller instructed Christopher to "take care of my boy [Blassingame]." (Tr. at 325, 5/5/94 B.) Meanwhile, Blassingame informed Fuller of the bribe schemes which he "horned in on." (Tr. at 325, Ex. 6/3/94 A.) The government's bait aside, the co-Defendants exhibited a pre-existing desire to participate with and enrich each other. Accordingly, because of the co-Defendants' individual and joint acts and pre-existing criminal relationship, we hold that the government's sting of Fuller's friend and co-conspirator, Blassingame, does not constitute "extraordinary" government inducement or persuasion.

Here, as we stated in *Hollingsworth*, "the government had merely furnished the opportunity to commit the crime to someone already predisposed to commit it." *Hollingsworth*, 27 F.3d at 1202. Thus, because Defendant Fuller showed no reluctance to engage in the criminal activity with only "ordinary" government inducement, we hold that Defendant Fuller did not establish sufficient evidence so that a "rational jury could have inferred that he was entrapped" and thus was not entitled to have an entrapment defense presented to the jury. *See Santiago–Godinez*, 12 F.3d at 727.[5]

---

5. Defendant Fuller also argues that the following evidence reveals his non-predisposition to commit bribery and the charged offenses: (1) character evidence through character testimony and having no prior convictions; (2) he never solicited the bribes; (3) his reluctance to accept bribes. As discussed above, Fuller's assertions that he never solicited the bribes and was reluctant to accept the bribes are contrary to the record. With regard to his character argument, Fuller's own account demonstrates criminal character, "I don't deal with two bit hustlers, okay, okay, okay, now I can deal with a crook knowing he's a crook like Johnny D. I know he's crooked as can be. But you know what? I like him, okay?" (Tr. 319, Ex. 5/10194 B at 11.) Accordingly, we find these arguments wholly inadequate to satisfy the defense's initial entrapment burden in light of the above conclusions on Fuller's lack of reluctance to engage in the criminal activity and the ordinary nature of the government's inducement.

## B. Denial of Defendant Fuller's Motion for Judgment of Acquittal Based on Entrapment and Insufficient Evidence

▇▇▇▇ Motions for acquittal should be granted only where "the evidence is insufficient to sustain a conviction." Fed. R.Crim.P. 29(a). The appellant "faces a nearly insurmountable hurdle [because] . . . . we consider the evidence in the light most favorable to the Government, defer to the credibility determination of the jury, and overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir.1997) (quotation omitted). We review *de novo* a district court's denial of a judgment of acquittal. *See United States v. Sax*, 39 F.3d 1380, 1385 (7th Cir.1994).

Defendant Fuller argues that the district court should have granted him a judgment of acquittal because he was entrapped as a matter of law. As previously discussed, this court finds that Fuller failed to present sufficient evidence so that a rational jury could find that he was entrapped. Thus, viewing "the evidence in the light most favorable to the government," *see Moore*, 115 F.3d at 1363, we find that the district court properly rejected Defendant Fuller's motion for acquittal on entrapment grounds.

▇▇▇ Defendant Fuller also argues that the government produced insufficient evidence that he knew about the Skokie Project conspiracy or accepted money from Christopher in exchange for or with any relation to Marlboro obtaining a subcontract with Wil–Freds. As previously discussed, Fuller accepted a $4,000 bribe from Christopher on December 16, 1992. The previous day, Fuller and Christopher spoke about the purpose of the bribe:

Christopher: I'm going to the bank right now.

Fuller: Um-mm

Christopher: On that job out in uh, in Skokie?

Fuller: Uh huh.

(Ex. 12/15/92 at 1.)

Further, on July 23, 1992, Blassingame and Christopher spoke about Fuller's involvement in the bribery scheme:

Blassingame: When the Wil–Fred thing hit, you know what Tom [Fuller] called about?

Christopher: What?

Blassingame: Huh. About the Wil–Fred's thing. He got wind that we're working on that thing.

. . .

Blassingame: Uh uh. The point I'm making . . . the point I'm making, John, is that we get the job okay? There's a stack of sixteen thousand sitting right there on the table, okay.

Christopher: That's all.

Blassingame: Okay, my thing on that is, Joe, for what you did you get fourteen. Tom [Fuller], for what you did you get two. I'll deal with that.

. . .

Blassingame: When Tom takes the lead on another project he might get the biggy.

(Ex. 7/23/92 at 3–5.)

On October 24, 1992, Gardner and Christopher also discussed Fuller's role in the conspiracy:

Christopher: Okay to get the job we needed, okay, with, we talked to Blassingame.

Gardner: Mmm hmm.

Christopher: Blassingame came back at us and he says, how much? And I says, I don't know. It was a competitive bid, okay? And I says, there was fourteen, if they're interested. Okay, there was, Blass wants four to Tom [Fuller] and ten to you.

Gardner: Uh huh.

Christopher: Is that your understanding?

Gardner: Right, right.

(Ex. 10/24/92 at 4–5.)

Moreover, when Fuller was questioned about the December 1992 bribe, Fuller admitted that he "knew it was Christopher's intention to give him money to win his favor basically and . . . to help him find land." (Tr. at 796.) Indeed, Fuller voted in favor of awarding the prime construction contract to Wil–Freds on September 10, 1992, approximately one month after Wil–Freds tentatively awarded the excavation subcontract to Marlboro. Also, because of Fuller's substantial influence as the president of the Water Reclamation District, he was in a position to prevent Christopher from receiving the excavation subcontract from Wil–Freds.

Accordingly, viewing "the evidence in the light most favorable to the government," we find that there is sufficient evidence from which the jury could find beyond a reasonable doubt that Defendant Fuller knew about the Skokie Project conspiracy and accepted money in exchange for official acts. *See Moore,* 115 F.3d at 1363.

## C. Denial of Defendant Fuller's Motion to Suppress Informant Testimony

██ Defendant Fuller argues that the district court committed reversible error when it denied his motion to suppress the testimony of Christopher. Relying on *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998), Fuller claims that the government violated 18 U.S.C. § 201(c)(2) by offering Christopher criminal immunity, a reduced sentence and security and expenses in exchange for his cooperation and testimony.

For reasons unexplained, Defendant Fuller fails to call to our attention that the Tenth Circuit's en banc has overruled *Singleton. See United States v. Singleton,* 165 F.3d 1297 (10th Cir.1999) (en banc). Further, we have specifically adhered to the longstanding holding of this Circuit that § 201(c)(2) does not require the exclusion of evidence obtained by a promise of immunity. *See United States v. Condon,* 170 F.3d 687, 688–90 (7th Cir.1999) (citing *United States v. Barrett,* 505 F.2d 1091, 1100–03 (7th Cir.1974) (holding that 18 U.S.C. § 201(h), the predecessor of § 201(c)(2), does not require evidence obtained through a promise of immunity be excluded)); *accord United States v. Haese,* 162 F.3d 359, 366–68 (5th Cir.1998); *United States v. Ware,* 161 F.3d 414, 418–25 (6th Cir.); *United States v. Johnson,* 169 F.3d 1092 (8th Cir.1999); *United States v. Lowery,* 166 F.3d 1119 (11th Cir.1999); *United States v. Ramsey,* 165 F.3d 980 (D.C.Cir.1999). Indeed, *Condon* also recognized the appropriateness of promises of reduced sentences and benefits under the Witness Protection Act in return for testimony. *See Condon,* 170 F.3d at 689. Because the government may promise immunity, benefits and security in exchange for truthful testimony under the law of this Circuit, we hold that Defendant Fuller's claim that the district court improperly denied his motion to suppress the government informant's testimony is without merit.

## D. Denial of Defendant Blassingame's Motion for Severance

██ Defendant Blassingame argues that the trial court erred in not granting his motion for severance. A district court's denial of severance will not be disturbed absent an abuse of discretion. *United States v. Marshall,* 75 F.3d 1097, 1105 (7th Cir.1996); *United States v. Boykins,* 9 F.3d 1278, 1288 (7th Cir.1993). Rule 14 of the Federal Rules of Criminal Procedure provides: .

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or pro-

vide whatever other relief justice requires.

Fed.R.Crim Proc. 14.

■ Particularly in conspiracy cases, "there is a strong interest in trying defendants who have been jointly indicted in a single trial." *United States v. Magana,* 118 F.3d 1173, 1186 (7th Cir.1997). Those interests include: (1) reducing the waste of judicial and prosecutorial time; (2) reducing the burdens on witnesses' time from testifying at multiple trials; and (3) reducing the chance each defendant will attempt to create reasonable doubt by blaming an absent co-conspirator. *See id.; United States v. Briscoe,* 896 F.2d 1476, 1516–17 (7th Cir.1990).

■ To succeed on appeal, Blassingame bears a heavy burden of demonstrating that he was prejudiced by the denial of his motion for severance. *See United States v. Sababu,* 891 F.2d 1308, 1330–31 (7th Cir.1989). This "danger of prejudice to the least guilty, or perhaps prejudice to all from the sheer confusion of a multidefendant trial, is in all but the most unusual circumstances considered outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all." *United States v. Shorter,* 54 F.3d 1248, 1258 n. 21 (7th Cir.1995) (quotation omitted). Thus, in challenging the district court's denial of a motion for severance, it is not enough that Defendant Blassingame shows that "a separate trial would offer him a better chance of acquittal." *See United States v. Cyprian,* 23 F.3d 1189, 1194 (7th Cir.1994). Rather, he "must establish that he suffered actual prejudice" from the denial of the motion, *see Marshall,* 75 F.3d at 1105 (citing *United States v. Pulido,* 69 F.3d 192, 207 (7th Cir.1995)), by showing that absent the severance, he was unable to obtain a fair trial. *See Magana,* 118 F.3d at 1186.

■ Defendant Blassingame's defense at trial was that the funds he received from Christopher and Agent Sofia were payment for his employment and payments that Blassingame passed on to Gardner were for Gardner's role as Christopher's political consultant and his political campaign. Defendant Fuller's defenses at trial were that Christopher's payments to him were gifts and government entrapment.

The facts underlying Blassingame's defense involve incidents that Fuller was not present at or involved in. These incidents involved payments that Blassingame passed on to Gardner, payments for which Fuller was not present. Likewise, Fuller's crimes involve direct acts between himself and Christopher. The $4,000 and $5,000 bribes occurred at meetings where Blassingame was not present. Thus, Blassingame's and Fuller's defenses are mutually exclusive and factually distinct.

Blassingame also argues that Fuller's counsel repeatedly hurt his case by referring to the payments made to Gardner and Blassingame as "bribe money." (Tr. at 455–59.) However, the district judge instructed the jury that statements of counsel should be "disregarded to the extent they are not supported by the evidence." (Tr. at 1468.) Also, the trial court instructed the jury to consider separately the evidence against each defendant. (Tr. at 1471–72.) *See United States v. Stillo,* 57 F.3d 553, 557 (7th Cir.1995) (holding that a criminal defendant "must rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court to consider each defendant separately" (quotation omitted)). Finally, the evidence against both Defendants was overwhelming; tape recording after tape recording of the bribes paid to Blassingame and Fuller were played for the jury. Because there is no evidence in the record of "actual prejudice" against Blassingame, *see Marshall,* 75 F.3d at 1105, we agree with the trial court's ruling and conclude that the court did not abuse its discretion in denying the

motion for severance.[6]

## CONCLUSION

The convictions of James W. Blassingame and Thomas S. Fuller are AFFIRMED.

6. The government argues that because Defendant Blassingame failed to make a pre-trial motion for severance or renew his oral motion for severance at the close of trial, we should review the district court's denial of severance for clear error. *See Cyprian*, 23 F.3d at 1194. We need not apply this more deferential standard because, as described above, we hold that there was no abuse of discretion by the trial court.