In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3781

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LINCOLN PLOWMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 10-CR-00151—**Larry J. McKinney**, *Judge.*

ARGUED SEPTEMBER 13, 2012—DECIDED NOVEMBER 20, 2012

Before MANION, SYKES, and HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge.* Lincoln Plowman was a local
government official in Indianapolis, Indiana, when he
accepted a bribe from an undercover FBI agent. Prior
to trial, the government filed a motion in limine seeking
to preclude Plowman from arguing an entrapment de-
fense. The district court granted the motion. A jury
then convicted Plowman of federal-funds bribery and
attempted extortion under color of official right. Plowman

appeals, and argues that the district court erred when it precluded him from arguing entrapment to the jury. We affirm Plowman's conviction.

I.

Lincoln Plowman had been a law enforcement officer since 1988 and advanced to the rank of major in the Indianapolis Metropolitan Police Department ("IMPD"). In November 2003, Plowman was elected to the Indianapolis-Marion County City-County Council ("Council"), and in November 2007, he was reelected to another term. Plowman became the majority leader on the Council in January 2008 and held that position through 2009. While he was on the Council, Plowman served as Chairman of the Metropolitan Development Committee, which oversees the zoning of Indianapolis and Marion County. This committee also oversees the appointment of officials to the Metropolitan Board of Zoning Appeals ("BZA"), which can grant variances to a property's zoning designation. As Chairman of the Metropolitan Development Committee, Plowman nominated his campaign manager to be a member of the BZA in 2008. Plowman's campaign manager was then appointed to the BZA, and Plowman supported his campaign manager's reappointment to the BZA again in 2009.

While serving in these official positions, Plowman apparently developed a reputation for his questionable

use of the power and influence he had acquired.[1] The Federal Bureau of Investigation ("FBI") became interested in Plowman's activities and set up a sting operation. The FBI had an undercover officer, "Mark," pose as a strip club owner from San Diego, California, who wanted to open a "five-star" strip club in Indianapolis. A confidential source agreed to arrange a meeting between Plowman and Mark.

Plowman met Mark on August 11, 2009, and during their very first conversation, Plowman talked about receiving money in exchange for his political influence. Just a few minutes into the conversation, Plowman stated that Mark would have trouble finding property in Indianapolis that was zoned for a strip club, and Plowman said, "Hey, you know what? . . . I could give you the reach around, and you could throw me some money, and you could spread some money out here. . . . [Y]ou're going to get the same thing afterwards, so why not tell you up front?" Plowman was the first person in the conversation to mention a payment. Plowman also began to discuss his role in local politics. He explained that he was a twenty-year veteran of the IMPD and the

---

[1] According to the government, Plowman had a history of accepting lucrative arrangements with business owners for questionable "consulting" work. Beginning in 2005 and continuing through 2009, Plowman used his influence to head off a smoking ban for PT's Showclub, a strip club in Lawrence, Indiana, that opposed the ban. Despite taking money from PT's Showclub, Plowman failed to file the appropriate disclosure forms for this off-duty income.

"number two guy on the City Council." Additionally, Plowman told Mark that he had been Chairman of the "Zoning Board" for two years, and for "a couple bucks," he knew how to "push" Mark's strip club through the BZA. In a second conversation later that day, Plowman again emphasized that he was well connected in local politics and had influence on the Alcohol & Tobacco Commission. Finally, in a third conversation that day, Plowman told Mark that because he "control[led] the Zoning," he would treat his work for Mark as "lobbying," and not as "some sort of a corruption or bribe thing." Plowman then explained, "I'll ask you for a couple of bucks, and . . . it's no secret, I'm gonna put some in my pocket," but he also added that he would "probably throw 50 percent of it around."

Plowman elaborated on his fee requirements about two weeks later, on August 26, 2009, when he and Mark had dinner and went to a strip club to further discuss Mark's plans. If Mark needed a zoning variance, Plowman assured Mark that he would be able to help because he had appointed several members to the "Zoning Boards" and therefore controlled them. But to exercise his political influence, Plowman said he needed a financial "retainer" from Mark. Plowman then proposed an arrangement in which Mark would pay "$5,000 [in] cash, and a $1,000 check made out to [Plowman's] campaign fund," which Plowman could then "spread around" and use to "schmooze" his political friends on the BZA.

Several weeks later, on September 18 and 19, 2009, Mark showed Plowman a building, called The Winery,

that he said he was interested in buying and converting into a strip club. But Plowman told Mark that The Winery would have zoning and liquor license issues. Plowman suggested that he could resolve these issues if Mark gave him some money for "a couple dinners . . . to make somebody put your app[lication] on top, or get you a little preferential legal treatment." Plowman explained that he was able to exert this influence because he oversaw the appointment of BZA officials, and he would not support the reappointment of officials who ignored him.

Plowman then began to look for suitable property for Mark's strip club. Plowman and Mark talked on October 9, 2009, and Plowman told Mark that he was working with a realtor to find a property that could be converted into a strip club. They talked again on October 29, 2009, and Plowman apologized for neglecting Mark's business venture. Plowman told Mark to buy a property soon because Plowman's appointees would no longer be on the BZA the following year, and "it might be easier if . . . we've got some people on there taking care of us, if you understand what I'm saying." Approximately two weeks later, Plowman followed up on these phone conversations and mailed Mark a booklet of potential properties that Plowman's realtor had compiled. Although many of the properties in the booklet were not suitable for a strip club, Mark called Plowman in late November to express interest in a property located near the airport. Plowman agreed to look into the property's zoning classification and the possibility of getting a liquor license for the property.

About a week later, on November 30, 2009, Plowman informed Mark that although the airport property did not meet the zoning requirements, there might be "some room for movement," but it would take a few weeks to determine if the property could get a zoning variance. Mark asked if he could help by coming to Indianapolis with his checkbook, and Plowman responded that "it might help me buy a couple dinners for some people that might be in the mood to listen to us." On December 3, 2009, Plowman told Mark that he had contacted an attorney who was going to look into the zoning status of the property near the airport, and Plowman noted that if there were any zoning issues, they could potentially be solved through a BZA variance. If the property needed a BZA variance, Plowman asserted that he would be "working behind the scenes with these guys on the variance boards," but he still needed to determine which BZA division would be the "friendliest." Plowman added that he had an appointee on the liquor board who could help Mark get a liquor license. After a few more conversations, Mark informed Plowman that he was prepared to move forward with the airport property, and was therefore coming to Indianapolis.

On December 22, 2009, Mark and Plowman met in a hotel room in Indianapolis that was secretly rigged to videotape the meeting. Mark had booked the room and was accompanied by two female undercover FBI agents. Plowman met Mark for the evening, and when the two undercover agents stepped out of the room, Plowman and Mark discussed the zoning variance. Plowman stated that his work on the project had been minimal,

and Mark only owed him a "thank you" at this point. But more work remained, Plowman indicated, and he would continue to help Mark by ensuring that the property's variance petition would be heard by a BZA division in which he had "friends," and by taking BZA members out to dinner "one at a time." Mark asked how much money it would take to obtain the variance, and Plowman responded that he would need "a little money to throw around." Mark then asked if he should still make the $5,000 and $1,000 payments, and Plowman stated that he would now need another "thousand or two" more to "throw around." Plowman explained that he would use the money to "throw a couple of dollars here and there," and he added that he needed "a few dollars here and there" to give to his wife.

Plowman and Mark then discussed when the payment should be made. Plowman said that he would take an "advance" for expenses, but would take his cut later. Mark insisted on giving Plowman the $5,000 in the hotel room, and Plowman agreed. Mark then gave Plowman $5,000 in $100 bills, and Plowman said that he would work hard for Mark and would "[t]ake care of the people that we need to take care of." FBI agents entered the room a few minutes later, revealed their investigation, and recovered the money. The agents did not arrest Plowman, and made it clear that he was free to leave. Plowman told the agents that he had accepted the money to cover his expenses and as compensation for the work that he did for Mark. Plowman conceded, however, that he did not have a side business and did not give Mark a receipt for the payment.

On March 8, 2010, Plowman retired from the IMPD at the rank of major. Then on September 15, 2010, a federal grand jury returned an indictment charging Plowman with federal-funds bribery under 18 U.S.C. § 666(a)(1)(B), and attempted extortion under color of official right under 18 U.S.C. § 1951(a). The government filed a sealed motion in limine requesting "an order in limine precluding the presentation of an entrapment defense during opening statement, the questioning of witnesses, the presentation of evidence, and closing argument unless and until defendant makes a sufficient showing or proffer of evidence." The district court granted the motion. The district court then held a jury trial, and after the trial was complete, the judge twice reiterated that he would not issue an entrapment instruction. On September 15, 2011, the jury found Plowman guilty on both counts. Plowman was sentenced to forty months in prison and two years of supervised release. He now appeals his conviction and argues that the district court erred by granting the government's motion in limine on the entrapment defense.

II.

A district court's pretrial determination that a defendant is not allowed to present an entrapment defense is reviewed de novo. *United States v. Santiago-Godinez*, 12 F.3d 722, 726 (7th Cir. 1993). Entrapment is usually an issue for a jury, but it can be addressed as a matter of law before trial if the defendant is unable to provide sufficient evidence that a rational jury could infer that

the defendant had been entrapped. *Id.* at 727. The defendant does not need to prove entrapment in such a pretrial proceeding, but the defendant has the burden to present more than a scintilla of evidence that entrapment occurred. *Id.* at 727-28. The district court must accept the defendant's evidence as true for purposes of this pretrial ruling. *United States v. Blassingame*, 197 F.3d 271, 279 (7th Cir. 1999).

Entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States*, 503 U.S. 540, 553-54 (1992). An entrapment defense contains two related elements: (1) government inducement of the crime; and (2) the defendant's lack of predisposition to engage in the crime. *Mathews v. United States*, 485 U.S. 58, 62-63 (1988); *United States v. Teague*, 956 F.2d 1427, 1433-34 (7th Cir. 1992). Courts often refer to predisposition as the "principal element" of this defense, but to present an entrapment instruction to a jury, a defendant must be able to proffer sufficient evidence of both elements. *See Mathews*, 485 U.S. at 62-63; *United States v. Kindle*, ___ F.3d ___, 2012 WL 4372519, at *6 (7th Cir. Sept. 26, 2012).

We have recommended analyzing the predisposition element first, but we have also recognized that "where there is insufficient evidence of inducement—either because there is no such evidence at all, or because the government did nothing more than offer a standard market deal in a sting—there is no need to consider predisposition." *United States v. Pillado*, 656 F.3d 754, 764-65

(7th Cir. 2011). The government's inducement does not always need to be "extraordinary" to satisfy the inducement element; even "minor government inducements" may be sufficient in some cases. *Id.* at 765-66. Inducement can occur through a variety of methods, such as "by grave threats, by fraud (the police might persuade [a defendant] that the act they want him to commit is not criminal), or, in the usual case in which entrapment is pleaded, by extraordinary promises—the sorts of promises that would blind the ordinary person to his legal duties." *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). In the bribery context, we have examined the size of the bribe offered to the defendant, the defendant's willingness to use political influence to help the undercover agent, and the nature of the relationship between the defendant and the undercover agent. *See Blassingame*, 197 F.3d at 282-83.

In this case, the government filed its motion in limine, and Plowman opposed the motion. He argued that the government had induced him into taking the bribe by creating an "extraordinary scheme" that "used a charismatic agent to prey on Plowman's desire to feel accepted and for friendship." Plowman further argued that Mark "resisted Plowman's repeated suggestions that it buy a club that did not need to be rezoned." The district court rejected these arguments and granted the government's motion in limine because Plowman had provided insufficient evidence that the government had induced him to accept the bribe. Because the district court found insufficient evidence of inducement, it did not address the predisposition element.

Plowman's proffer was too vague and conclusory to be sufficient for an entrapment instruction to the jury. Instead of proffering specific evidence about inducement, Plowman merely alluded to his desires and feelings about Mark and to generalized summaries of the FBI's sting operations.

Although Plowman's proffer was thin, the evidence presented at trial provided a clearer record about the facts of this case. The evidence presented at trial, including tapes and transcripts of Plowman's conversations with Mark, is not reasonably in dispute and disproves the vague generalities in Plowman's pretrial proffer, which we believe is too vague to warrant the deference accorded to pretrial proffers under *Blassingame* and *Santiago-Godinez*. The transcripts overwhelmingly show that Plowman was not entrapped into accepting the bribe. In reviewing the district court's pretrial decision, we are not required to close our eyes to that indisputable evidence.

The district court correctly concluded that there was insufficient evidence that the government induced Plowman to accept the bribe. First, the bribe was a relatively small amount; it was not large enough to be labeled an inducement. We have previously hypothesized that if the government "offered a derelict $100,000 to commit a minor crime that he wouldn't have dreamed of committing for the usual gain that such a crime could be expected to yield, and he accepted the offer and committed the crime, that would be entrapment." *Evans*, 924 F.2d at 717. But a bribe for a comparatively small

value is not likely to be an inducement. That was the case in *Blassingame*, in which we ruled that bribes totaling $9,000 were insufficient to establish inducement. *Blassingame*, 197 F.3d at 283. In this case, Plowman accepted a bribe of $5,000 in cash, and had an expectation that he would receive a $1,000 campaign contribution and perhaps a "thousand or two" more. Although this bribe was large enough for Plowman to wine and dine government officials and still have money left over for his own personal use, the bribe was still less than the bribe in *Blassingame*.

Additionally, Mark did not mislead Plowman into thinking that Plowman was performing a legal business service. Plowman argues that he took the money as payment for legitimate "consulting," such as contacting realtors and attorneys, but that mischaracterizes Plowman's activities. From Plowman's very first meeting with Mark, Plowman focused on the zoning issues that Mark faced. To address these zoning issues, Plowman discussed his plans to influence various government officials by taking them out to dinner and obtaining their cooperation by leveraging his appointment power. When Plowman requested money from Mark, the money was not just to reimburse a realtor or attorney, but to help Plowman "schmooze" other public officials and to line his own pockets. After the FBI revealed its sting operation, Plowman admitted that he did not have a side business and had not given Mark a receipt for the $5,000.

Plowman further argues that he would have only conducted legal "consulting" work had Mark not

"resisted Plowman's repeated suggestions that [Mark] buy a club that did not need to be rezoned." The evidence, though, does not support this argument; rather, the evidence shows that Plowman voluntarily collected information about a wide variety of properties, many of which were not suitably zoned. But even if Mark had guided Plowman's inquiries to properties that had zoning issues, this shows—at most—that Mark was persistent. Although persistence can become a form of inducement, Mark's undercover interaction with Plowman lasted a mere five months, and Mark's conversations with Plowman were too infrequent to establish inducement through persistence. *Compare United States v. Highman*, 98 F.3d 285, 290 (7th Cir. 1996) ("[P]ersistence . . . in the absence of coercion . . . does not establish inducement."), *and United States v. Theodosopoulos*, 48 F.3d 1438, 1447 (7th Cir. 1995) (finding no inducement when the defendant's inter-action with the government occurred over "three months and nine meetings"), *with Jacobson*, 503 U.S. at 552-54 (ruling that the government had "exerted sub-stantial pressure" and induced the defendant to commit a crime after the government "devoted 2½ years to con-vincing [the defendant] that he had or should have the right to engage in the very behavior proscribed by law").

Finally, Plowman was an active and willing participant in his discussions with Mark. We recognize that induce-ment can occur when a government agent preys on a defendant's emotional weaknesses. *See Sherman v. United States*, 356 U.S. 369, 373-75 (1958) (ruling that the gov-

ernment induced a recovering drug addict to commit a crime by appealing to the addict's sympathy and convincing him to return to his drug habit). Plowman claims that Mark preyed on his "desire to feel accepted and for friendship," but Plowman was a seasoned politician and a law enforcement officer, and had none of the traits of someone who was emotionally weak like the recovering drug addict in *Sherman*. Instead, Plowman bragged about the power that he was able to assert as a member of the Council, as an appointing authority for the BZA, and as a high-ranking officer in the IMPD. Additionally, a defendant must present evidence of such "unusual or unfair persuasion." *See United States v. Hall*, 608 F.3d 340, 343-44 (7th Cir. 2010). The record in this case, however, contains no evidence that Mark affected Plowman's behavior by appealing to Plowman's emotional vulnerabilities. Instead, the record shows that Plowman was the instigator of the bribery scheme. In Plowman's first conversation with Mark, Plowman brought up the idea of a payment when he said, "Hey, you know what? . . . I could give you the reach around, and you could throw me some money, and you could spread some money out here." Furthermore, Plowman—and not Mark—was the first person to detail the method of payment for Plowman's "consulting" services. Without any evidence of emotional manipulation, Plowman fails to establish inducement.

## III.

The FBI conducted a standard sting operation that did not induce Plowman to accept a bribe. To argue entrap-

ment to a jury, Plowman needed to provide sufficient evidence of both inducement and a lack of predisposition, but he failed to establish the first element. Because the district court did not err in granting the government's motion in limine on the entrapment defense, we AFFIRM Plowman's conviction.